LIBERTY NATIONAL LIFE INSUR-
ANCE COMPANY, Inc.,
Appellant,

v.

Betty S. HAMILTON, Appellee.

No. 12709.

United States Court of Appeals
Sixth Circuit.

Oct. 10, 1956.

---

Fred B. Collier, Royal Oak, Mich., Philip Pratt and Clarence L. Smith, Pontiac, Mich., for appellant.

No appearance for appellee.

Wilbur W. Piper, Knoxville, Tenn. (Fowler, Rowntree & Fowler, Knoxville, Tenn., on the brief), for appellant.

Robert P. McClure, Knoxville, Tenn. (Erby L. Jenkins, Jenkins & Jenkins, Knoxville, Tenn., on the brief), for appellee.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

SIMONS, Chief Judge.

This appeal involves the question whether there is liability on the part of an insurance company to an applicant for insurance where a first premium has been paid, a so-called "binding receipt" therefor given, and a medical examination had, but before approval of the application the applicant dies. The application was made by James Alvis Hamilton and suit was begun by the appellee as beneficiary upon denial of liability. The case was tried to a jury which returned a verdict for the appellee and the appeal is from the judgment which followed.

On February 28, 1954, the insurance company, which already carried a $5,000.00 life insurance policy on Hamilton under a group plan, solicited from him, through its agent, an additional $9,270.00 life policy. Hamilton paid the initial premium and received from the agent a "binding receipt" or "binder" on the face of which was stated: "Received from Hamilton fourteen and seventy-five hundredths dollars ($14.75) cash, in connection with this application for insurance, which application bears the same date and number as this receipt." The application provides: "If a full premium * * * has been paid at the time of making this application, and declaration of such payment is made therein, the insurance subject to the terms and conditions of the policy applied for and in use by the company at this date and subject to the limitations contained in paragraph 2 shall take effect on the date specified in (a) or (b) below, provided the applicant is on such date in good health and a risk acceptable to the company under its rules, limits and standards, for the plan and amount applied for, and at the rate of premium declared paid."

Subsection (a) provides that if a medical examination is required under the terms of the application and Part (1) of the application is completed, *"the insurance granted hereunder"* shall take effect on the date of completion of the medical examination. Subsection (b) provides that if a medical examination is not required under the terms of the application and Parts 1 and 2 thereof are completed, the *insurance granted hereunder* shall take effect on the date hereof unless the applicant is notified that a medical examination is required, in which case *"the insurance granted hereunder"* shall take effect on the date of completion of the medical examination. Section 2 recites: "In no event shall the issuance

of this receipt cause the total liability of the company under this receipt, any other such receipt, and any other policy or policies on the life of the applicant to exceed $100,000.00." Section 3 provides that if the insurance applied for is not effective, the company's sole liability shall be a return of the premium. There is also a provision regarding nontransferability of the receipt and a recital that the company's agents are barred from giving any other form of receipt for a premium collected at the time of taking the application.

The reverse side of the "binding receipt" sets out declarations by the applicant that his statements and answers are true and material, that any policy issued shall constitute the entire contract of insurance and that the company shall not be bound by any statements or promises made to or by the agent or other persons, unless reduced to writing and submitted to the company at its Home Office and made a part of the contract. It also recites that the insurance applied for shall not be considered in force until a policy shall have been issued, accepted, and the first premium paid during the applicant's good health. The first insurance year shall begin with the date of the policy and the first premium shall carry the proposed insurance only until the next premium paying date named in the policy irrespective of the date of delivery or of premium payment.

Section 3 of the declaration is a statement of understanding that a medical examination is required if the amount of insurance applied for exceeds $5,000.00 and Section 4 recites that the company shall have sixty days from the date of the receipt within which to consider and act upon the application and that if within such period a policy has not been received or if there has been no notice of approval or rejection, the application shall be deemed to have been declined by the company.

Hamilton applied for the insurance and paid a premium on February 28, 1954. On March 23rd, he dropped dead suddenly. On April 27th, the insurance company sent a formal rejection of the application addressed to Hamilton although it knew for about a month that he had died. Upon receipt of this rejection, the appellee brought suit on the theory that the issuance of the "binding receipt" effected a contract of temporary insurance necessitating rejection of the application during the life of the applicant in order to preclude liability and upon the further theory that the rejection was not in good faith. The appellant defended on the ground that there was no contract in force; that the application was a mere offer not accepted by the company and that under its terms the insurance coverage would be retroactive to the date of the completion of the medical examination only if on that date the applicant was in good health and a risk acceptable to the company under its rules, limits and standards; that it acted properly in rejecting the application within the sixty day period it allegedly had under the terms of the application and receipt. The errors complained of at the trial were that the Court erred in refusing to direct a verdict in favor of the insurer at the close of all the evidence; erred in allowing Dr. Armstrong, Hamilton's family physician, to give his opinion that Hamilton was an insurable risk at the time of the application and that the Court erred in refusing to grant special instructions to the jury, requested by the appellant.

The vital issue as it was presented to us by brief and argument is whether or not the "binding receipt" was a contract for temporary insurance, creating a liability in the event that the applicant died before the application was acted upon. In those cases where liability has been imposed in comparable cases two principles have been relied upon: 1) that where there are conflicting or ambiguous recitals as to the time when the insurance becomes effective, the conflict is resolved against the insurer and 2) that considerations of public policy make it fundamentally unfair for an insurer to collect a premium while providing no coverage for the period reserved by the insurer to consider and act upon the application.

Before analyzing the cases which deal with these principles, it becomes necessary to recite the medical history of the decedent and the steps that were taken by the insurer to process the application. Hamilton at the time of his death was employed as a construction worker engaged in strenuous physical labor. Prior thereto, he had been in the Army, at least from 1943 to his discharge from the service in 1949. While there, a physical examination disclosed that his blood pressure was too high, a condition later explained as being due to anxiety caused by the knowledge that he was to be sent overseas right after the then recent death of his father. In the course of his construction work, Hamilton had complained of abdominal pains suffered after jumping from a barge. He entered the Baptist Hospital on November 5, 1952 and Fort Sanders Hospital on May 30, 1953 for brief periods in search of the cause of such pain. At both institutions, he was cared for by Dr. Charles Armstrong and in each case was released in an apparently improved condition though the cause of his ailment remained undiagnosed. At Baptist Hospital, in November 1952, he was given an electrocardiogram test. The medical significance of this test was disputed by the testimony at the trial.

On March 4, 1954, after payment of his premium and the delivery to him of the "binding receipt," Hamilton was examined by appellant's Dr. Pierce and also submitted a statement of his medical history which made full disclosure of the two checkups in the hospital. On March 16, 1954, Dr. Pierce made a further examination to recheck his pulse rate which on the first examination proved to be too high. It is evident that the physical examination made by Dr. Pierce proved to be satisfactory since no abnormalities were disclosed and his application was not rejected. In the meantime, Hamilton's medical history had been sent to the Home Office of the company where its Medical Director, Dr. Secor, wrote to Dr. Armstrong, on March 10, 1954, asking for details of diagnosis and treatment of Hamilton's epigastric disorder. No reply being received, other letters were sent to Dr. Armstrong on March 25 and on March 31. Dr. Armstrong replied on April 21 stating that Hamilton died of an acute coronary occlusion on March 23, 1954, "he dropped dead suddenly." At the trial, Dr. Armstrong admitted that he had reached this conclusion as to the cause of death only by a process of logical thinking. There had been a report by the coroner, an official with no formal medical training, who examined Hamilton after his death. The coroner's diagnosis was that he died of a heart attack. No autopsy was ever performed. Dr. Armstrong testified that the electrocardiogram test was without significance, that Hamilton didn't have heart trouble at the time of his hospitalization and was in good health up to the time of his death. The general purport of his evidence was that electrocardiogram tests are not always reliable and in this respect he was corroborated by Dr. Wood, an expert in the reading of cardiograms, testifying for the company:

"Q. The reading of James Alvis Hamilton that he made, was that abnormality severe enough to effect his soundness of health? A. I don't know the answer to that one because this tracing while it was definitely abnormal, it was not indicative of the man's general physical condition at that time. In other words, he could have had that condition as a result of this abnormality of the blood vessel in the heart wall. It could have taken place anytime from a month to twenty five years previous so I could not say what his physical condition was at the time of the electrocardiogram tracing; that would have to be determined by a thorough examination. * * I do not know anything about it actually, especially about the man's general physical condition at all."

The lay testimony of persons knowing Hamilton and observing him strongly supported Dr. Armstrong's opinion.

In Bellak v. United Home Life Insurance Co., 6 Cir., 211 F.2d 280, we had occasion to study and consider the effect of a "binding receipt" and the payment of a first premium upon the liability of an insurance carrier. We pointed out that in Gaunt v. John Hancock Mutual Life Insurance Co., 160 F.2d 599, certiorari denied 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858, the Court of the Second Circuit allowed a recovery based on the application and payment of premium, even though no policy had been issued and the application had not been approved by the company at the Home Office as required by the terms of the application; that the Court there relied upon the view that the binder clause in the application was ambiguous; that considering the application as a whole, the ordinary person applying for insurance would not believe that his coverage was delayed until some later date when it received final approval at the Home Office and that such ambiguity must be construed in favor of the insured. We pointed out also that the ruling in the Gaunt case had received approval in 60 Harvard Law Review 1164 and 15 University of Chicago Law Review 379; that other courts had either followed the Gaunt case or had independently come to the same conclusion, namely Wolfskill v. American Union Life Insurance Co., 237 Mo.App. 1142, 172 S.W.2d 471, Duncan v. John Hancock Mutual Life Ins. Co., 137 Ohio St. 441, 31 N.E.2d 88; Leube v. Prudential Insurance Co. of America, 147 Ohio St. 450, 72 N.E.2d 76, 2 A.L.R.2d 936, and Stonsz v. Equitable Life Assurance Society, 324 Pa. 97, 187 A. 403, 107 A.L.R. 178, the last case which discusses the reasons why such interim insurance is held effective. However, the Bellak case was controlled by the law of Michigan as announced in Smiley v. Prudential Insurance Co., 321 Mich. 60, 32 N.W.2d 48, which held that the provisions of a comparable application which required the application to be approved at the Home Office before the insurance became effective were controlling to the end that there was no valid contract of insurance. We were also controlled by Smiley. We held that the District Judge correctly followed the Michigan ruling. Bellak was, nevertheless, reversed because of a factual question not there fully or sufficiently developed to justify disposing of the case on a motion for summary judgment because the record failed to show that there had been an adverse report from the medical examination and we were of the view that an unreasonable delay might, under some circumstances, constitute an approval, citing cases.

This leads us to an excursion into the law of Tennessee and a consideration of the cases relied upon by the appellant. McLendon v. Woodmen of the World, 106 Tenn. 695, 64 S.W. 36, 52 L.R.A. 444, does recite that no policy of insurance is in force until all the conditions precedent to the application, receipt and bylaws of the fraternal order (there the carrier) had been complied with. However, in that case, the terms of the instruments were clear and free of ambiguities and there had been no payment of advance premium. That case is not controlling of Tennessee law in applications which present conflicts or ambiguities. Woodfin v. Neal, 16 Tenn.App. 481, 65 S.W.2d 212, is also not persuasive. While there was in that case the payment of a premium, the opinion deals essentially with the granting of reformation of a policy against the insurer where its fraud, coupled with a unilateral mistake, moved a court of equity to avoid construction of the policy as written as a counter-offer to which the appellant had not assented before his death. There, too, the receipt was clear and absence of ambiguity was stressed. National Life & Accident Insurance Co. v. Fox, 165 Tenn. 264, 54 S. W.2d 951, left open the question as to the legal effect of the instruments where their language was ambiguous. We are, therefore, left in doubt as to what the holdings in Tennessee would be if there were conflicting provisions or ambiguities as to the time when the insurance would become effective.

The present application indicates that under varying circumstances differ-

ing dates might be assumed by an inexperienced applicant to be dates when his coverage begins. Section 1(a) provides that if a medical examination is required, the insurance shall take effect at the date of its completion; Section 2 provides that, in no event, shall the issuance of a receipt cause the total liability of the company on the life of the applicant to exceed $100,000.00. Here, is inference that under some circumstances the issuing of the receipt creates a liability, if the policy applied for, alone or with other policies, fails to exceed that amount. There is also the provision in Section 2 of the Declaration that the insurance shall not be considered in force until a policy has been issued by the company and received by the applicant. There is language in the instruments which would indicate to an unsuspecting and untutored applicant that he had interim coverage while the company was giving consideration to his medical history. Repeatedly, the application speaks of *"insurance granted hereunder"* and while the receipt given is not formally designated as a "binding receipt," it has been so denominated in the briefs and arguments and similar receipts have continually been so designated in adjudicated cases. A "binding receipt" connotes obligation and when supported by valid consideration suggests a contract.

██ The reasoning of Judge Learned Hand, in the Gaunt case, is logical and persuasive. Speaking of an application, he said [160 F.2d 601]: " * * * but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered * * * only as of the date of approval. * * * A man must indeed read what he signs, and he is charged, if he does not; but insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion."

It must be noted here that Judge Clark's concurrence in the Gaunt case indicates that he would have placed the result squarely upon the inequity in accepting a payment of premium without coverage.

██ We do not ignore the provision that approval is conditioned upon the applicant being in good health at the time and a risk acceptable to the company under its rules, limits and standards. There was, however, substantial lay and medical evidence that Hamilton was in good health at the time of his medical examination. While there was conflict, it presented a question of fact for the jury which it was its province alone to answer. We attach no importance to the requirement that the risk be acceptable to the company under its rules, limits and standards where the record fails to show that Hamilton had knowledge of company standards when he signed the application and paid his premium. The Court submitted to the jury the question whether Hamilton's medical examination had been completed so as to make the coverage effective on that date. A careful reading of the record and the reports of the examining physician indicates that there were no further physical tests they desired to make.

There is respectable authority for the proposition that where a premium has been paid there is insurance coverage, regardless of other stipulations in the application or receipt. Chestnut v. Security Mutual Life Insurance Co., 208 Mo.App. 130, 232 S.W. 203; Bigalke v. Mutual Life Insurance Co. of Baltimore, Mo.App., 34 S.W.2d 1019. These cases are discussed in 44 Yale Law Journal, 1223, 1299, and that is the purport of Judge Clark's concurring opinion in the Gaunt case.

██ We are not persuaded that the admission of Dr. Armstrong's opinion as to the health of the applicant was error. Dr. Armstrong was a physician of long experience and for many years examining physician for important insurance companies. McCormick's Handbook on Law of Evidence, Rogers on Expert Testimony, 3d Ed., p. 683. Nor was the Court

in error in denying the motion for a directed verdict. Moore Federal Practice, Vol. 5, p. 2314 et seq.

We hold that there was a contract for interim insurance between the decedent and the applicant subject only to its subsequent rejection by the company, if made during the life of Hamilton. There was no such rejection.

Affirmed.