No. 44,877

Zelma E. Service, *Appellee,* v. Pyramid Life Insurance Company, Incorporated, *Appellant.*

(440 P. 2d 944)

*J. Eugene Balloun,* of Great Bend, argued the cause, and *H. Lee Turner, Max E. Eberhart* and *Jack G. Duncan,* also of Great Bend, were with him on the brief for the appellant.

*Jack E. Dalton,* of Dodge City, argued the cause, and *Jim Mangan,* also of Dodge City, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action brought by the beneficiary under a term life insurance policy of the defendant company in the amount of $20,800, the amount of insurance applied for. The trial court found the defendant liable to the beneficiary for the full amount of the insurance, and awarded attorneys' fees as a part of the costs on the ground that the insurance company refused to pay without just cause or excuse.

Appeal has been duly perfected to this court by the insurance company from all adverse decisions.

Essentially, the question on appeal is whether the judgment of the trial court is supported by substantial competent evidence. There is also a question on the admissibility of evidence, and several questions of law.

The case was tried to the court with an advisory jury. After hearing the case the advisory jury returned its answers to special questions, and the court took the matter under advisement requesting counsel for the respective parties to submit suggested findings of fact and conclusions of law.

Thereafter the trial court announced its findings of fact and conclusions of law as follows:

"FINDINGS OF FACT

"1. On June 30, 1964, plaintiff Zelma Service, her husband, Gerald W. Service, Steve Miller, local soliciting agent for defendant [Pyramid Life Insurance Company, Incorporated—appellant], and Joe Stewart, employee and *regional manager for defendant,* met at the Services' home in Jetmore relative to purchasing term credit life insurance on the lives of plaintiff and her husband. Gerald W. Service had some life insurance at that time. One policy was for $3,000.00 with the Alliance Life Insurance Company, and another for $5,000.00 with First Kansas Life Insurance Association. Both of these policies would expire on July 3, 1964. These facts were known generally by Joe Stewart and Steve Miller. After discussing the purchase of the insurance Mr. and Mrs. Service each made application on that day to defendant insurance company for credit term life insurance in the amount of $20,800.00.

"2. On June 30, 1964, at the Services' home, Zelma Service handed to Joe

Stewart the premium check which she wrote personally for the first premium for the Gerald W. Service policy. It was drawn upon her bank account. When the first premium check was handed to Joe Stewart she asked him if Gerald Service would be covered, *to which Mr. Stewart responded that Gerald Service was covered upon payment of the first premium.*

"3. Gerald W. Service and Zelma Service relied upon the statement of Joe Stewart and intended to allow and did allow the credit life insurance policies totaling $8,000.00, as above described, to lapse. Zelma Service was the beneficiary under both of said lapsed policies.

"4. The Hanston State Bank was a creditor of the said Gerald W. Service, but the indebtedness due it was adequately secured by the pledge of assets worth more than such indebtedness.

"5. On July 1, 1964, Gerald W. Service was given a physical examination by J. G. O'Shea, M. D. of Jetmore, Kansas, and the report of the such examining physician was forwarded to the defendant at its home office in Mission, Kansas, and received in due course.

"6. After the payment of first premium *a 'conditional receipt for first premium' was executed and delivered to said Gerald W. Service.* The portions of such receipt pertinent to this case provided as follows:

" 'Receipt from Gerald W. Service the sum of $31.34 on June 30, 1964, as payment on a first premium on a policy of Life Insurance on each person proposed for insurance on the application bearing the same printed serial number as this receipt, subject to the conditions on the reverse side.'

"The conditions on the reverse side that are pertinent to this cause provided follows:

" 'That *if the company at its home office after investigation shall be satisfied that on the date hereof, or on the date of the medical examination for such insurance, whichever is later,* each person proposed for insurance was insurable and entitled under the company's rules and standards to insurance on the plan and for the amount applied for at the company's published rates corresponding to the age of each person proposed for insurance, *the insurance protection applied for shall by reason of such payment . . . take effect from the date hereof or from the date of such medical examination, whichever is later.'*

"7. The medical examination report was received by the company at its home office and delivered to the underwriting department of the defendant on or about July 6, 1964.

"8. The application with the check for the first premium was received by the defendant at its home office and delivered to the defendant's underwriting department on or about July 7, 1964, at which time ordinary underwriting procedures relative to said application were undertaken.

"9. At the request of the defendant a routine investigation of the said Gerald W. Service was made by the Retail Credit Company from its Wichita, Kansas, office. The results of such investigation were reported to the defendant by such retail credit company in its 'special narrative life report' (Exhibit #5). Such special narrative life report was dated July 14, 1964, and was received by the underwriting department of the defendant at its home office on or about July 15, 1964.

"10. *By July 16, 1964, the defendant company was satisfied that on the date of the application the said Gerald W. Service was insurable and entitled under*

*the company's rules and standards to insurance on the plan and for the amount applied for.*

11. *By July 16, 1964, the said defendant had decided to issue Gerald Service's policy as originally applied for.*

"12. *Gerald W. Service died on July 21, 1964, as a result of injuries sustained in an automobile accident.*

"13. On the morning of July 22, 1964, following Gerald Service's death, Zelma Service sent word to Clarence Wilson, principal owner of the Hanston Insurance Agency, that she wanted to see him. After receiving word that Zelma Service wanted to see him, Clarence Wilson, on July 22, 1964, at approximately 9:30 o'clock a. m. telephoned Harold G. Parrot, First Vice-President of the said Pyramid Life Insurance Company at its home office in Mission, Kansas, for the purposes of turning in a claim and determining if everything was in order. During such telephone conversation, Clarence Wilson asked Harold G. Parrot if Gerald Service was covered by the Life Insurance applied for. *Harold G. Parrot* left the phone for a few minutes, returned and *replied to such inquiry, in substance, 'It looks like everything is in order.'*

"14. Following such telephone call, said Clarence Wilson went to Plaintiff's home in Jetmore, Kansas, and informed her of the telephone call and that everything was in order and that the policy would be paid. He further informed her that there would be approximately $14,000.00 of the insurance proceeds remaining after the payment of a certain indebtedness.

"15. *Gerald Service was eligible for life insurance with the Pyramid Life Insurance Company at standard rates at the time of his application.*

"16. Gerald Service drank intoxicating beverages. The evidence is not clear and no finding can be made as to whether or not he ever became intoxicated and the frequency and duration of any periods of intoxication.

## "Conclusions of Law

"1. On June 30, 1964, by virtue of the oral representation made to Gerald Service and Zelma Service by Joe Stewart and the payment of the first premium an oral contract of insurance was effected on Gerald Service's life in the amount of $20,800.00 and the defendant is now estopped to deny the existence of life insurance coverage at the time of Gerald Service's death.

"2. By virtue of the insurability of the said Gerald W. Service for the amount and on the plan applied for according to the standards of the defendant at the time of his application for insurance, the terms of the conditional receipt became effective on July 1, 1964, the date of the medical examination, and Gerald Service was insured pursuant to said receipt for $20,800.00 at the time of his death on July 21, 1964.

"3. The said Harold Parrot's statement that everything was in order constituted a ratification of said contract of insurance.

"4. The defendant had accepted Gerald Service and although the formal policy had not been prepared, the plaintiff should have judgment against defendant for $20,800.00 plus interest thereon from July 22, 1964, at the rate of 6 per cent per annum.

"5. Although certain misrepresentations may have been made by the said Gerald Service in his application for insurance with the defendant company, any such misrepresentations, if made, can not be said to have been material or render the policy void since the defendant has failed to show or introduce

any evidence that the matter misrepresented actually contributed to the death of Gerald Service as required by K. S. A. 40-418. Moreover, no defense based upon misrepresentation in obtaining or securing such policy is valid in this case since the defendant failed to deposit in court for the benefit of the plaintiff the premiums received on such policy at or before the trial as required by K. S. A. 40-419.

"6. The defendant refused without just cause or excuse to pay the full amount due plaintiff and therefore, as provided by K. S. A. 40-256, plaintiff is entitled to a reasonable sum as attorneys' fees to be recovered and collected as part of the costs, which costs should be assessed to the defendant. The amount of attorney fees can only be properly determined after a hearing on the subject. Therefore, the question of how much should be allowed for attorney fees is held open for further hearing, and the Plaintiff's counsel will be permitted to furnish the Court evidence on that subject." (Emphasis added.)

The remarks added by the trial court after completing the foregoing conclusions were as follows:

"This Court, in making its Findings of Fact, attempted to consider of primary importance the answers the jury gave to the questions submitted to it. Considerable evidence was heard by the Court that the jury did not get to hear. This evidence was also considered by the Court in making its Findings and Conclusions. In this manner the Court believes it obtained a full, true and complete picture of the facts involved in this matter and was better able to visualize what the true material facts and equities were."

The trial court, after hearing the defendant's motion to amend the findings of fact, or in the alternative for a new trial, overruled the motion for a new trial but made additional findings of fact as follows:

"ADDITIONAL FINDINGS OF FACT

"1. Gerald Service made application for insurance at standard rates for his age.

"2. Gerald Service failed to disclose on his application to Pyramid Life Insurance Company that he had been hospitalized with an illness involving the intestines, but the court finds that this fact is not material in this case.

"3. Zelma Service's application had a discrepancy in the birth date. On July 16, 1964, Pyramid Life Insurance Company sent a request to the Hanston Agency for clarification and such clarification arrived at Pyramid's office on July 21, 1964.

"4. July 18, 1964, was a Saturday and July 19, 1964, was Sunday and Pyramid Life Insurance Company offices closed on those dates."

Judgment was thereupon entered for the plaintiff in the sum of $22,703.20, which includes $1,903.20 interest at the rate of 6% per annum from the 22nd day of July, 1964, until the date of judgment on the 1st day of February, 1966.

On the 18th day of February, 1966, the trial court heard the matter on the allowance of attorneys' fees to be awarded the

plaintiff under K. S. A. 40-256. It took the matter under advisement, and on the 26th day of February allowed a fee of $6,500 which it considered reasonable and in keeping with the provisions of 40-256, *supra,* and the facts and circumstances surrounding the case. In so doing the trial court took into consideration, among other things, the expenses of plaintiff's counsel and a contingent fee contract providing for expenses and a contingent fee of 25%, which the trial court found to be a proper and fair contingent fee contract.

Except for the questions of law hereafter discussed, the court is called upon to determine whether there is substantial competent evidence to support the judgment. The appellant contends the evidence offered by it at the trial, which conflicts with that of the appellee, should now be considered by this court.

The universal rule in this state has long been that if the "findings are supported by substantial competent evidence they will not be disturbed on appeal and this court will not weigh conflicting evidence but will examine the record only for the purpose of determining whether there is substantial competent evidence to support the judgment." (*M & B Drilling Co. v. Campbell,* 197 Kan. 323, 325, 416 P. 2d 777, and authorities cited therein.)

The findings of fact made by the trial court succinctly set out in chronological order the pertinent facts in the case. References throughout the opinion to "Mrs. Service" or "plaintiff" indicate the appellee, and references to "Company," "Pyramid," or "defendant" indicate the appellant.

The evidence established that the Service family had operated a trucking business in the small town of Jetmore, Kansas, for approximately thirty years. Mrs. Service kept the books, did the income tax work and determined routes for the drivers. Life insurance was a factor to be considered in their business affairs, so on June 30, 1964, the Services conferred with their local insurance agent and banker, as well as Joe Stewart.

Steve Miller, who was their local insurance agent, had been working for the Hanston State Bank for a period of four years. On the date in question he and Clarence Wilson also operated the Hanston Insurance Agency. These men were agents for the Pyramid Life Insurance Company. They were not employees of the company but were independent contractors.

Joe Stewart was the *regional manager* of Pyramid covering the area of Kansas, Arkansas, Oklahoma and a part of Missouri. On the 30th day of June, 1964, he was present at the home of the

Services for the purpose of assisting one of the agents in his region.

After a discussion by the Services with their local insurance agent and Joe Stewart, a decision was made to apply for policies of $20,800 each on the lives of Mr. and Mrs. Service. At the time there were two existing life insurance policies, one for $5,000 and one for $3,000 on the life of Mr. Service, which were to expire on July 3, 1964, only three days later. Naturally, in order to make a decision as to the renewal of the policies about to expire, the time that coverages would be effective under the Pyramid policies for which application was made became important.

The evidence that all parties present were aware of the impending expiration of current policies is competent and substantial. It comes from the three survivors of the four parties present during the conference on June 30, 1964, Mrs. Service, Steve Miller and Joe Stewart, who was still a regional manager for Pyramid at the time of trial.

Mrs. Service testified, "Then, the fact that these two credit life policies were due in July, I believe they did expire in July, we wanted to get his policy into force so that we would have coverage." Steve Miller was aware of the impending expiration period, and Joe Stewart on cross-examination acknowledged that he heard the dates of expiration mentioned, although he could not testify or remember what they were at the trial.

The deceased, the fourth member of the conference that afternoon, spoke through Mr. Miller. Mr. Miller asked Mr. Service if he wanted to renew the credit life policies which were expiring in the near future, and Mr. Service said, "No," that he didn't want to renew them because the purpose of the new policy was to replace the credit life policies.

The fact that all parties present were aware of the policies soon to expire, and the need for immediate coverage, is not only supported by substantial competent evidence but is uncontroverted.

The evidence that Joe Stewart without equivocation stated that coverage was immediate upon payment of the first premium is abundant. Mrs. Service testified that when she prepared the check for the first premium, she inquired of Mr. Stewart if her husband would be covered, and he replied, " 'As soon as you sign your name to this check he's covered by the insurance.' "

Steve Miller testified that he told Mr. Service he would be covered immediately, and that when the check for the first premium

was given to Mr. Stewart, Stewart said that Mr. Service would be covered immediately upon payment of the first premium.

Stewart stated only that it was possible that he said the words, "You are covered," and that he could not swear to whether or not he used conditional or qualifying words in this case. The appellant contends the words Mr. Stewart used were "If accepted, you are covered," and that Mr. Stewart explained to plaintiff's husband that if he did not pass the medical examination he would not be covered.

There is additional evidence in the record. Pyramid had meetings from time to time. One of these meetings took place at the Lake of the Ozarks after the Service application was made. It was a convention of the company agents and regional managers, and was attended by *Mr. Wilson and Mr. Stewart.* Mr. Parrot, Pyramid's executive vice president, was leading a discussion and asked whether any of the other agents ever told people they were covered by insurance when they paid their first premium. When Parrot asked how many of the agents had made that representation, several of them raised their hands, indicating that they did. One of these persons was *Joe Stewart,* a regional manager of the company. This would indicate that at least with the Pyramid Life Insurance Company, the practice of telling applicants they were covered immediately upon payment of the first premium was prevalent and even accepted as a fact by regional managers.

The testimony of Steve Miller discloses that with Mr. Stewart there to advise him concerning the particular insurance program involved, and relying on the fact that Stewart assured Mrs. Service she was covered, when she handed him the check for the first premium, Steve Miller permitted the policies terminating on July 3, 1964, to expire. The fact that these policies were permitted to expire under these circumstances is evidence that the Services and Mr. Miller firmly believed that the new Pyramid policy applied for by the Services afforded immediate coverage upon payment of the first premium.

At this point in the review, it may be said without equivocation that findings of fact Nos. 1, 2 and 3 made by the trial court are supported by substantial competent evidence.

By reason of these facts the trial court concluded (conclusion of law No. 1) that on the 30th day of June, 1964, by virtue of the oral representation to Mr. and Mrs. Service by Joe Stewart and the payment of the first premium an oral contract of insurance

was effected on the life of Gerald Service in the amount of $20,800, and that Pyramid is now estopped to deny the existence of life insurance coverage at the time of Gerald Service's death.

The appellant argues that even assuming Mr. Stewart made the oral representations as found by the trial court in finding No. 2, and that Mr. Stewart did not make it clear to the decedent that coverage was conditional upon passing the medical examination, the foregoing theory of recovery cannot stand as a matter of law. The appellant relies upon *Bozich v. Metropolitan Life Ins. Co.,* 155 Kan. 573, 127 P. 2d 499, for the proposition that under Kansas law a soliciting and collecting agent's authority is limited to that conferred on him in writing by his company. The appellant points out that Stewart's contract with Pyramid was introduced into evidence, and that it contains no authority to alter or waive any provisions of the application given to Mr. Stewart by Mr. Service.

Under Kansas decisions where it is written in the application for insurance that the company shall not be bound by any statement made by an agent, the insurance agent cannot make any oral modifications of the written contract or modify the terms and conditions under which the policy shall be used or become effective. (*Smither v. United Benefit Life Ins. Co.,* 164 Kan. 447, 190 P. 2d 183, and cases cited therein at p. 455.)

In the case at bar the application stated:

". . . ( *c* ) that neither the agent nor the medical examiner has authority in behalf of the Company to accept risks, or to make, alter, or amend the policy or to extend the time for making any payment due on such policy; . . ."

The advisory jury in answer to special question No. 6 answered that neither the agent nor the regional manager of Pyramid was authorized to vary the terms of any conditional receipt issued by the company, but the trial court did not make any specific finding on this point.

The difficulty with the appellant's position is that it assumes Joe Stewart was a soliciting agent of Pyramid. Such an assumption is erroneous. Mr. Stewart was much more than an agent as the term is defined and applied in the cases cited by the appellant. Mr. Stewart testified he had been employed by Pyramid for about fifteen years. He started out as an agent, then became a *district agent,* then a *general agent,* and then became a supervisor, which is the same as a regional manager, all of which were steps up for him in his life with Pyramid. He had district agents under his supervision in his region covered by Kansas, Arkansas, Oklahoma and

a part of Missouri. It is clear Mr. Stewart occupied a position higher in the echelon of Pyramid than a general agent, and he was present on June 30, 1964, for the purpose of assisting one of the agents in his region.

The contract which Pyramid had with Stewart, in effect on June 30, 1964, was introduced in evidence. It was very broad and general in nature. It discloses that he has agents under his supervision and the power to appoint agents. (See, K. S. A. 40-238.)

This court has recognized the difference between an "insurance agent," as defined in K. S. A. 40-239, usually called a soliciting agent, and a "general agent." (*West v. Metropolitan Life Ins. Co.,* 144 Kan. 444, 61 P. 2d 918.)

Even if it be assumed that Stewart had no express authorization to waive conditions against the immediate effectiveness of a contract of life insurance, his position with Pyramid gave him implied or apparent authority to do so. The brief nature and generality of his employment contract left much to his discretion.

A summarization of the law on this point is made in 29 Am. Jur., Insurance, § 151, as follows:

". . . Stated differently, a person who has charge of the company's business in a state and *who acts under general instructions, without special limitations upon his authority,* is a general agent. Indeed, the view has been taken that whatever an insurance company may do can be done by its general agents. . . . Accordingly, agents have been regarded as general agents where they fully represent the insurance company in a particular district and are authorized to solicit insurance, receive money and premiums, issue and renew policies, *appoint subagents,* and adjust losses. It has also been stated that a general agent of an insurance company has the power to *waive policy provisions against the immediate effectiveness of a policy,* since the presumption of the authority created by the powers actually conferred upon and exercised by a general agent is such as to clothe him in the eyes of the public with the incidental power of waiver. . . ." (p. 551.) (Emphasis added.)

Further, in 29 Am. Jur., Insurance, § 193, the following is said:

"The authority of an insurance agent to accept risks and make contracts of insurance in behalf of the insurer depends, of necessity, upon the circumstances of the particular case. No general rule can be satisfactorily evolved which will fit all cases other than that an insurance contract is binding upon the insurer if entered into by an agent acting in such respect within his express, *implied, or apparent* authority, or if the contract is *subsequently ratified* by the insurer.

"Examining the particular cases in which the authority of agents in such respect has been considered, it is found to be generally true that general agents have authority to make contracts and issue policies. One who is apparently the general agent of an insurer may bind his company to a special risk, *although his instructions deny him that authority,* if that fact is unknown to the insured. . . ." (p. 584.) (Emphasis added.)

Kansas decisions are consistent with the foregoing summarization holding that a general agent of an insurance company can modify the insurance contract or waive a condition of a written policy by parol, and this is true even though the policy contains a printed stipulation to the contrary. The landmark case in this jurisdiction is *Insurance Co. v. Gray,* 43 Kan. 497, 23 Pac. 637. The rule was thoroughly approved and forcefully supplemented in *Insurance Co. v. Munger,* 49 Kan. 178, 30 Pac. 120. Other cases adhering to the principle expounded in the *Gray* case are: *Insurance Co. v. Straughan,* 70 Kan. 186, 78 Pac. 447; *Nichols v. Maxson,* 76 Kan. 607, 92 Pac. 545; *Hulen v. Insurance Co.,* 80 Kan. 127, 102 Pac. 52; *Manross v. Oil Co.,* 88 Kan. 237, 128 Pac. 385; and *Lattner v. Federal Union Ins. Co.,* 160 Kan. 472, 163 P. 2d 389. See, also, 81 A. L. R. 829, and the annotation commencing at p. 833.

The theory upon which the rule proceeds is that insurance companies are corporations and can act only through agents. The powers of insurance agents to bind their companies are varied by the character of the functions they are empowered to perform. While their powers may be limited by the companies, the general rule is that parties dealing with *general agents* as to matters within the real or apparent scope of their agencies are not affected by such limitations unless they had notice of the same. A general insurance agent clothed with authority to make contracts of insurance, to renew contracts, or to issue policies stands in the place of the company to the assured. His acts and declarations in reference to such business are the acts and declarations of the company. Thus, the company is bound by anything said or done by the general agent in relation to the contract or risk, either before or after the contract is made. (*Insurance Co. v. Munger,* supra.)

In holding that a general agent of an insurance company had power to alter or waive any of the terms or conditions of an insurance policy by parol, the court in *Insurance Co. v. Gray,* supra, said:

"If it was within the power of the company, acting through its agents, to waive a condition or change the contract, it surely might do so by a parol contract, and might even waive the provisions stated in the policy with reference to the manner of altering or waiving its terms and conditions. In *Insurance Co. v. Earle,* 33 Mich. 143, the court, in considering the question whether an agent of a company might change by parol the conditions of a policy wherein it was provided that it could only be done upon the consent of the company written thereon, held that the written policy might be changed by parol, and stated that 'a written bargain is of no higher legal degree than a parol one. Either may vary or discharge the other, and there can be no more

force in an agreement in writing not to agree by parol than in a parol agreement not to agree in writing. Every such agreement is ended by the new one which contradicts it.' See also *Ins. Co. v. Fahrenkruk*, 86 Ill. 463. In the present case, as in some of the cases cited, it was stipulated in the policy that no agent of the company, or any other person than the president or secretary, should have authority to alter or waive any of the terms or conditions of the policy, or make any indorsement thereon; and all agreements of the president or secretary must be signed by either of them. This provision, however, may be modified by the company to the same extent as any other; and whatever the company can do may be done by its general agents . . ." (pp. 504, 505.)

In the instant case the application made by Gerald Service on the 30th day of June, 1964, for life insurance in the initial amount of $20,800 was incomplete in that the answers to all special questions on the reverse side pertaining to the applicant's physical condition, his medical history, and his family history, were left blank. After each question a "square" was provided for a "yes" or "no" answer, and none of the squares was checked either "yes" or "no." Therefore, the trial court's additional finding No. 2 that Gerald Service failed to disclose on his application to Pyramid that he had been hospitalized with an illness involving the intestines, is somewhat misleading and requires explanation. Mr. Service was not required to answer these questions on the 30th day of June, 1964, and his application in this form was accepted together with the initial premium payment under circumstances supervised personally by Pyramid's regional manager, Mr. Stewart.

On the 1st day of July, 1964, Dr. James G. O'Shea, M. D., of Jetmore, Kansas, who had known Mr. Service for three and one-half years and was his family physician, made a medical examiner's report authorized by the "Hanston Bank," signed also by Gerald Service, in which an answer was given that Mr. Service had not had any "Disease or disorder of digestive system (stomach, intestines, liver, gall bladder)." The answer was also given that Mr. Service did not use, and had never used, alcoholic beverages or narcotics. The medical report indicates that Gerald Service was in excellent health on the date of the report, and Doctor O'Shea answered that he had no pertinent information which might affect longevity. This report by reference therein was made a part of the application for insurance with Pyramid. In his testimony Doctor O'Shea acknowledged performing the medical examination on Mr. Service on the 1st day of July, 1964; that the answers written on the medical report form were written by himself; but that the answers indicated thereon were the answers of Mr. Service to questions put by the doctor.

The medical report, however, was not a part of the application made by Gerald Service when Mr. Stewart accepted the first premium payment from Mrs. Service upon the assurance to her that Mr. Service was covered upon payment of the first premium.

The situation in the case at bar is analogous to the application made in the *Gray* case. There in the application for insurance the applicant gave correct answers to the general agent of the company respecting encumbrances on the property, but the general agent failed to mention the encumbrances in the written application and procured the signature of the applicant. The contention of the company that misrepresentations in the application relieved it from liability was rejected on the ground that the provision in the insurance policy respecting encumbrances on the property insured had been waived by the general agent.

Here the regional manager, Mr. Stewart, accepted the application of Mr. Service in the form and in the manner submitted to Mr. Service for signature on the 30th day of June, 1964, with the statement that Mr. Service was covered by insurance upon payment of the first premium, the premium payment having been accepted by the company under the supervision of its regional manager simultaneously with the application. Both Mr. and Mrs. Service relied upon the statements of Stewart, who was acting on behalf of the company with implied or apparent authority to do so, under circumstances in which both Mr. and Mrs. Service and Pyramid's soliciting agent, Steve Miller, had no reason to doubt his authority to make such statement and bind the company thereby. An oral contract of insurance was thus effected on the life of Gerald Service in the amount of $20,800 which was in force at the time of Gerald Service's death.

It may be successfully argued that the written limitation on an agent's authority set forth in the application, heretofore quoted, was confined to Pyramid's soliciting agents, but even if it were not, Mr. Stewart, the regional manager for Pyramid, had implied or apparent authority to waive such provision which, by implication, he did.

Of what significance is the "conditional receipt for first premium" given to Gerald W. Service for the initial life insurance premium payment?

It is the practice of many life insurance companies to state in their applications that the contract of insurance shall not take effect until the application has been approved by the company,

the first premium paid by the applicant, and the policy delivered. Where this is the situation a period intervenes between the signing of the application by the applicant and the delivery of the policy. During this period no money has been advanced to the insurance company, and no insurance is in effect. This interval, of a few days to several weeks, depending upon the time consumed in investigation and physical examination of the applicant, in passing upon his application at the home office, and in the traveling of the application and policy to and from the home office, is undesirable from the point of view of the insurer as well as the applicant. The disadvantage to the applicant consists in the fact he is not covered by insurance during this period, while the disadvantage to the insurer consists in the fact that during this period the applicant possesses the power to revoke the offer made in his application. This disadvantage is a real one as far as the insurer is concerned, because the applicant may decide to exercise his power, either because he chooses not to carry any insurance at all, or because he chooses to purchase it from a rival company. In that event the company suffers to lose what it has expended for the investigation and medical examination of the applicant, aside from the loss of business itself.

To alleviate this situation insurance companies have seized upon the idea of issuing binding receipts to the applicant upon the payment of the first premium. These binding receipts, or conditional receipts, as they are sometimes called, usually contain a provision to the effect that the insurance shall be considered as in force from the date of the receipt, or the date of the medical examination, provided the application is approved and accepted at the home office of the insurer.

In the instant case it is uncontroverted that the "conditional receipt for first premium" was issued to Mr. Service on the 30th day of June, 1964, when the first premium was paid. (See Finding No. 6.)

The issuance of these binding receipts effectively does away with the disadvantage threatening the insurer. The applicant to whom the binding receipt is issued feels contractually obligated to perform, and it serves to give the insurer the use of premium money at the earliest date possible. It further offers a selling point of which no agent fails to make the utmost in his talks with prospective customers.

These binding receipts are the subject of an extended annotation

entitled "Temporary life, accident, or health insurance pending approval of application or issuance of policy," in 2 A. L. R. 2d 943-1022. Many cases up to 1948 are there accumulated after reporting *Leube v. Ins. Co.*, 147 O. S. 450, 72 N. E. 2d 76, 2 A. L. R. 2d 936.

There is a great confusion of authority as to the effect to be given such receipts. Because of the similarity of wording usually found in them, attempts have been made to generalize their operation. If these apparently conflicting authorities are examined, however, it becomes clear that these receipts are not capable of general treatment, but must be individually interpreted to give them the effect which the parties intended them to have in each case. The fundamental question is: What was their intention? (*Stonsz v. Equitable Life Assur. Soc.*, [1936] 324 Pa. 97, 187 Atl. 403, 107 A. L. R. 178, and see annotation in 107 A. L. R. 194.)

The written terms of the receipt issued in the instant case as they are set forth on the reverse side (a portion of which is disclosed in Finding No. 6) read:

"It is understood and agreed that the payment referred to on the reverse side of this receipt is made and accepted subject to the following conditions:

"1. That if the Company at its Home Office after investigation shall be satisfied that *on the date hereof, or on the date of the medical examination* for such insurance, whichever is later, each person proposed for insurance was *insurable* and entitled under the Company's rules and standards to insurance on the plan and for the amount applied for at the Company's published rates corresponding to the age of each person proposed for insurance, the insurance protection applied for shall by reason of such payment [except as otherwise provided in item (16) of the application] take effect from the date hereof or from the date of such medical examination, whichever is later. In any event, *the amount of insurance becoming effective under the terms of this receipt is limited to the extend that in the event of the death of the Proposed Insured, the total liability of the Company shall not exceed $250,000 inclusive of life insurance and accidental death benefit in force with the Company on the date of the application.* If less than the full first premium has been paid, *such insurance protection shall nevertheless become effective on said date* but shall be deemed temporary only and to expire at the end of the period for which the amount tendered would provide such insurance on a pro rata basis.

"2. That if any check, draft or money order given in payment of the premium is not paid on presentation, this receipt shall be void.

"3. That *if said application is not approved and accepted by the Company* within sixty (60) days from the date hereof, then insurance applied for shall not become effective, and the amount tendered shall be returned. Any delay in the return of the amount tendered shall not be construed as approval of the application." (Emphasis added.)

A binding receipt of this nature has not previously been considered by the Kansas court. The question posed is: Does the language of

the receipt indicate an intention to create temporary insurance coverage for the time during which the approval of the application was pending?

In cases where liability has been imposed in comparable situations two principles have been relied upon: (1) that where there are conflicting or ambiguous recitals as to the time when the insurance becomes effective, the conflict is resolved against the insurer; and (2) that considerations of public policy make it fundamentally unfair for an insurer to collect a premium while providing no coverage for the period reserved by the insurer to consider and act upon the application.

A distinction is sometimes made in the cases between a receipt generally referred to as the "insurable" type rather than the "approval" type. These receipts provide as a condition that the insurance will be in force if at the date of the application or medical the applicant was insurable, or in good health, or be a risk acceptable under the company's rules on the plan of insurance applied for at the rate of premium paid. If the application is subject to approval or acceptance by the company the receipt is spoken of as the "approval" type. In *Cliborn v. Lincoln National Life Insurance Co.,* (10th Cir. 1964) 332 F. 2d 645, the United States Court of Appeals for the Tenth Circuit, anticipating Kansas law, held under what was denominated an "insurable" type receipt that it was a conditional receipt and if the requirements were not met—that the applicant was *insurable* on the date of the application—no temporary insurance agreement came into being. It is noted, however, the court distinguished *Liberty National Life Insurance Co. v. Hamilton,* (6th Cir. 1956) 237 F. 2d 235, on the ground it was an "approval" type receipt and did not warrant further consideration. Nevertheless, for all practical purposes, the receipt in both the *Cliborn* and *Hamilton* cases were substantially identical in that insurability was a condition of the receipt. The view that the applicant is protected pending acceptance or rejection of life insurance under the "approval" type receipt is expressed in I Couch on Insurance (2nd Ed.) § 14:42 (the contrary position is discussed in § 14:41), whereas the "insurability" type receipt is discussed in § 14:45. (See, 2 A. L. R. 2d, § 16, p. 986.)

A binding receipt similar to the one in the instant case was before the Sixth Circuit Court of Appeals in *Liberty National Life Insurance Co. v. Hamilton,* supra. The court noted that the receipt on the one hand indicated insurability as a condition precedent to

liability, whereas on the other hand the inference was left that under some circumstances the issuing of the receipt creates a liability in the event the applicant died prior to the issuance of the policy. There the receipt provided that in no event shall the issuance of a receipt cause the total liability of the company on the life of the applicant to exceed $100,000, whereas in the instant case the amount of the insurance becoming effective under the terms of the receipt is limited to the extent of $250,000 in the event of the applicant's death. By reason thereof, the court held the receipt to be ambiguous as to its meaning and construed it against the insurance company as a contract for interim insurance subject only to rejection by the insurer if made during the applicant's lifetime. In the opinion the court said:

"The reasoning of Judge Learned Hand, in the Gaunt case [*Gaunt v. John Hancock Mut. Life Ins. Co.*, 160 F. 2d 599, cert. denied 331 U. S. 849, 91 L. Ed. 1858, 67 S. Ct. 1736], is logical and persuasive. Speaking of an application, he said [160 F. 2d 601]: '* * * but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered * * * only as of the date of approval. * * * A man must indeed read what he signs, and he is charged, if he does not; but insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion.' It must be noted here that Judge Clark's concurrence in the Gaunt case indicates that he would have placed the result squarely upon the inequity in accepting a payment of premium without coverage." (p. 240.)

The purpose of the clause in the instant case that the insurance shall take effect "on the date hereof, or on the date of the medical examination for such insurance" was to provide an inducement for the payment by the applicant of the first premium in advance, and to give preliminary protection to the insured until the issuance of the policy. The disadvantages pending the delivery of the policy in the ordinary situation while awaiting the issuance of the policy, are avoided by the preliminary agreement entered into by the parties for their mutual benefit. The insured believes that this binder is valid. In the instant case, the applicant was assured by the regional manager of the insurance company that he was covered upon payment of the first premium when the binding receipt was issued to him. The subject of negotiation between the parties was life insurance in the amount of $20,800 on the life of Mr. Service, and clearly the statement of the regional manager was

intended to mean that the insured was covered by life insurance in the amount of $20,800. Whether the regional manager was speaking of temporary life insurance or not is immaterial on the facts in this case, because the insured died prior to the issuance of the policy or notification of the fact that his application at the company's published rates corresponding to his age had been rejected. If the conditions imposed by the "conditional receipt for first premium" are construed as conditions precedent, they must be regarded as having been waived by the regional manager. (*Halle, &c. v. New York Life Ins. Co.,* [1900] 22 Ky. L. R. 740, 58 S. W. 822.)

Many cases in the courts indicate a trend to construe the conditions liberally, and to treat receipts similar in wording to the one before us as binding during the interim regardless of the ultimate action of the insurance carrier on the application. These decisions are based upon the assurance that if the receipt meant anything, no other result could have been intended by the parties, for unless the insured was to be protected against death during the interim period there would be no advantage to him in paying his premium in advance. If the company did not intend that there should be insurance effective pending the date of the application, or medical, as in this case, and the date of the approval of the risk and the issuance of the policy, then the company would be charging and obtaining the full amount of the premium for one year, while the period of actual insurance would be as many days less than one year as there were days intervening between the date of the application and the approval. In other words, the insured would be paying for something which he did not receive. (*Stonsz v. Equitable Life Assur. Soc.,* supra, and cases cited therein.)

A binding receipt issued by a life insurer connotes obligation, and when supported by valid consideration, suggests a contract. (*Liberty National Life Insurance Co. v. Hamilton,* supra.)

If it cannot be said upon interpretation of this binding receipt that Mr. Service was insured from the date of the binder, or medical, until a formal policy was issued or the risk declined by the insurance company, then it must be said this binding receipt is ambiguous, and, if so, it should be construed against the insurance company, it having been drawn up and issued by the agents of the insurance company upon its printed form.

If there was to be no contract of insurance in any event until the application was approved, and a policy issued thereon, it would

seem entirely immaterial to the insured whether the contract related back to the date of the application (or medical) or not. If he lived until the application was approved and a policy issued, it would seem to be a matter of indifference to him whether he had been insured during the interim between the date of the application and the date of the issuance of the policy. On the other hand, if he died before the application was approved and the policy issued, his beneficiary would derive no benefit from the insurance. The chief object of the provision would, therefore, seem to be to enable the insurance company to collect premiums for a period during which there was in fact no insurance, and consequently no risk. (*Starr v. Mutual Life Ins. Co.*, 41 Wash. 228, 83 Pac. 116.)

Under authorities which hold temporary insurance to be in effect, the conditions imposed by the receipt herein would be treated as conditions subsequent. The company was bound to act either affirmatively or negatively on the application. The insured, if an acceptable risk, was entitled to a policy. If he was not acceptable, the insurance company was required to so notify him, and return the premium paid, or if rated up, notify him by tendering an application at the higher rate. On the facts in the instant case the insured was never notified during his life that his application was accepted, rejected, or that it would be considered at a higher premium. Here the money for the first premium was retained by the insurance company until after the insured's death, when tender was made to his beneficiary for a return of the premium, which she rejected. (*Stonsz v. Equitable Life Assur. Soc.*, supra; *Albers v. Sec. Mut. Life Ins. Co.*, 41 S. D. 270, 170 N. W. 159; and *Reynolds v. Northwestern M. L. Ins. Co.*, 189 Iowa 76, 176 N. W. 207.)

Where the provisions in a binding receipt are construed as providing temporary insurance protection until such time as the insurer has considered the application and announced its determination to accept or reject the risk, the insurer cannot terminate the risk so assumed unless the insured is notified in his lifetime that his application was rejected. (*Colorado Life Co. v. Teague*, [Tex. Civ. App. 1938] 117 S. W. 2d 849; *The Commercial Union Assurance Co. v. The State, ex rel. Smith et al.*, [1888] 113 Ind. 331, 15 N. E. 518; and *Halle &c. v. New York Life Ins. Co.*, supra.)

We hold on the facts in this case temporary insurance was in force on the life of Mr. Service in the sum of $20,800 at the time of his accidental death. This is consistent with the assurance of

Mr. Stewart that the insured was covered upon payment of the first premium and gives effect to the intention of the parties.

Thus, the insurance company herein accepted the liability for insurance created by the preliminary agreement in the form of a binding receipt of which it had not been divested by rejection of the application.

Furthermore, the findings of the trial court that the insured was eligible for life insurance at standard rates, that Pyramid was satisfied the deceased was eligible for life insurance at standard rates, and that he was accepted by Pyramid, are all supported by substantial competent evidence disclosed by the record.

Our decision upon the foregoing points makes further consideration of many points raised by the appellant unnecessary. Generally it may be said, after carefully reviewing the record presented on appeal, all findings of fact made by the trial court are supported by substantial competent evidence.

The appellant complains that it was highly prejudiced because the trial court permitted Mr. Scott, an examiner of questioned documents, to give an expert opinion, and to testify, upon a fact already conceded by the appellant in the trial of the case. It is argued the only possible purpose of his testimony was to emphasize strongly a fact which had already been conceded, and to raise an inference of fraud in the case, even though fraud was not alleged, proved or even asserted.

In view of such attack we think consideration of the point is warranted.

For the chronology of events and the facts as they were developed in the trial of the case, reference is made to the trial court's findings of fact. Finding No. 9 refers to a retail credit company report made as a result of the appellant's investigation. The credit company's special narrative life report indicated that Mr. Service may have had a drinking problem which was not disclosed in the medical report. By reason of this report and other evidence, the appellant contends the record established that Mr. Service did use alcohol, had been hospitalized for an intestinal disorder, had arthritis periodically and had hemorrhoids, all contrary to the medical report which was made a part of his application. As a result the appellant attempted to establish in the trial of the case that the underwriter knew Mr. Service could not be classified for standard insurance at the standard rates, and that he would have to be rated up. The appellant's evidence was to the effect that it reinsures the risk on

the excess of $20,000 on all policies with another company; that by reason thereof it was forced to abide by the underwriting standards of the reinsurance company; that according to those standards Mr. Service was a substantial risk and his application for insurance at the standard rates would have to be rejected; but it was determined to offer to take him at an increased premium of fifty percent.

At the pleading stage of the case the appellant took the position in its answer that *on July 17, 1964,* the life underwriting department determined standard insurance could not be offered Mr. Service. Apparently, in an effort to solidify its position that this decision was made *on July 17, 1964,* the appellant further asserted the supplemental application, providing for increased premium, was prepared on that date and forwarded under date of July 22, 1964. The answer further alleged that *a true and correct copy of the letter and supplemental application* were attached to and made a part of the answer. The answer further alleged that the original of such supplemental application which was forwarded to the Hanston Insurance Agency did not bear the date of July 17, 1964, but that it was left blank to be filled in by Mr. Service if he elected to make supplemental application to the company.

Up to the time of the filing of Pyramid's answer the appellee had in her possession only the original supplemental application which contained no date.

It was important for Pyramid to establish that it had made some decision soon after July 15, 1964, since its file was complete at that time and some decision could have been made. Otherwise, it was faced with the embarrassing fact that it did nothing on the application until July 22, 1964, the day after Mr. Service's death.

Mrs. Service knew that she and her husband had made application for life insurance and that her husband had paid the first premium based upon the representations and assurances of Mr. Stewart and was given a receipt. She also knew then that after her husband's death her banker and insurance agent had contacted the company and had been assured that everything was in order. Then she is notified on one hand that her husband could be accepted at a higher rate, and on the other hand she is advised by the company through the company's local agent that Mr. Service could not be insured and the return of her money is tendered.

The importance of July 17, 1964, to Pyramid is evident from its answer where it is mentioned many times.

Rather intense discovery procedure conducted by both sides then

yielded appellant's exhibit No. 25, as well as many other exhibits introduced at the trial. Appellant's exhibit No. 25 is entitled "Underwriting Information" *dated July 16, 1964.* It was addressed to the Hanston Insurance Agency concerning the applicant, Zelma E. Service of Jetmore, Kansas. Written in red type at the bottom of this information sheet was the following statement:

"According to our information, Mrs. Service's correct date of birth is October 1, 1906 instead of August 1, 1906. *These applications are ready for issue of policies* but we must clear up this question of correct month of birth. Please advise us about this without delay." (Emphasis added.)

(On the basis of this evidence the trial court found by July 16, 1964, the appellant had decided to issue Gerald Service's policy as originally applied for.)

With the discovery procedure apparently complete, questions still remained as to why the date of July 17, 1964, appeared on the carbon copy and not on the original of the supplemental application. The dilemma created by the problems was not resolved or clarified through the discovery procedures. In the discovery deposition of Edna Faust, the chief underwriter for Pyramid, she could not explain what happened or why there was a span of five days from the date the supplemental application was typed to the day it was actually transmitted to the Hanston Insurance Agency, nor could she say who typed it or whether it was dictated or typed by her.

The appellant continually referred to standard underwriting practices. Nevertheless, Mrs. Faust could not enlighten the appellee. Thus, from the pleadings, discovery procedures, and pretrial, there was no other assertion made by the appellant than that the copy of the supplemental application with the date July 17, 1964, was a carbon copy of the original sent to to the Hanston Insurance Agency with the letter dated July 22, 1964, (the day after Mr. Service's accidental death).

At pretrial the appellee was granted permission to have the two exhibits in question examined by an expert, and counsel for the appellant made no objection.

Mr. Scott's finding that one was not the duplicate or carbon copy of the other was revealed to counsel for the appellee as promptly as possible after his analysis of the two documents. Pursuant to agreement by counsel this fact was communicated to counsel for the appellant. Mrs. Faust then, at the trial, denied any contention that one was the exact duplicate of the other. Since she took that position at the trial Pyramid wanted the court to deny the appellee

the opportunity to have Mr. Scott testify, after he had discovered this rather interesting fact. All of the evidence presented by Pyramid sought to establish the decision of the company to reject Mr. Service for standard insurance was made on July 17, 1964.

If the carbon was not the carbon copy of the original sent to the Hanston Agency, the question arose as to what happened to the original of the carbon copy remaining in the file. Mrs. Faust could not explain this.

Under these circumstances Mr. Scott was called as a rebuttal witness to attack the credibility of the appellant's witnesses and the exhibits used to establish the date of July 17, 1964, as the date Pyramid made its decision to reject Mr. Service for standard insurance. The testimony of the appellant's witnesses was buttressed by the carbon copy of the supplemental application bearing the date of July 17, 1964.

Not only did Mr. Scott establish that one exhibit was not the carbon copy of the other, but he also established that it was unusual to find a situation where two copies, typed at different times, would have such remarkable alignment.

Mr. Scott in analyzing the two documents in question made blown-up photo prints of the original supplemental application at the location where the date was left blank to show in detail the texture of the paper. They disclosed no erasures had been made on the original. Other exhibits were made by technique in photography to show by grid spacing the typed letters on the two exhibits, the original and the carbon copy. These exhibits disclosed the spacing of the typed portions of the documents to be perfectly aligned with each other to the nonexpert observer. Mr. Scott disclosed a few discrepancies, such as the "G" in the name of Gerald W. Service, typed on the original, was slightly lower and out of line with the remainder of the typed name, whereas this situation did not appear on the purported carbon copy.

It is truly remarkable in observing these two exhibits that anyone could make such an exact copy with a second run through the typewriter. Both the advisory jury and the trial court no doubt found this to be more than a coincidence. That the testimony of Mr. Scott may have had the effect of implying fraud on the part of Pyramid cannot be denied.

The evidence of the appellee had previously established that Mr. Parrot, the first vice president of Pyramid, had received word by telephone from Mr. Wilson of the Hanston Insurance Agency at

9:30 a. m. on July 22, 1964, of Mr. Service's accidental death on the previous day.

Where a party to a lawsuit introduces rebuttal testimony and evidence in the form of exhibits attacking the credibility of his adversary's witnesses and the evidence upon which they rely, the fact that such rebuttal testimony and the exhibits in support thereof may incidentally or by implication suggest fraud on the part of such adversary does not render the testimony of such rebuttal witness or the exhibits upon which he relies inadmissible in evidence, and the devastating effect of such rebuttal testimony cannot be avoided by claiming that it prejudiced the trier of the facts. It is one of the hazards of a lawsuit concerning which the aggrieved party cannot legally be heard to complain.

The qualifications of an expert and the admissibility of his testimony are matters within the sound discretion of the trial court, and unless the judge excludes the testimony he shall be deemed to have made the findings requisite to its admission. (*Taylor v. Maxwell,* 197 Kan. 509, 419 P. 2d 822.)

The appellant contends the trial court erred in allowing attorneys' fees, and in allowing the amount awarded.

The trial court found Pyramid refused without just cause or excuse to pay the full amount of insurance money due plaintiff as provided by K. S. A. 40-256 and was therefore entitled to a reasonable sum as attorneys' fees to be recovered and collected as part of the costs. (Conclusion No. 6.)

The appellant contends this finding is in error because there was just cause for the company's refusal to pay.

This court has repeatedly held that where an insurance company refuses to pay, the question of whether or not the attorneys' fees are to be allowed must depend upon the facts and circumstances of each particular case, and that only where the insurer refuses without just cause or excuse to pay in accordance with the terms of the policy will there be allowance of reasonable attorneys' fees. (*Parker v. Continental Casualty Co.,* 191 Kan. 674, 383 P. 2d 937.)

The appellant first asserts that there was no policy in existence at the time of the death of Mr. Service, and in accordance with the provisions of 40-256, *supra,* attorneys' fees are allowable only where a judgment is rendered against an insurance company on a policy of insurance. It is argued the company here did not refuse to pay on a policy.

The pertinent portion of K. S. A. 40-256 provides:

"That in all actions hereafter commenced, in which judgment is rendered against any insurance company as defined in section 40-201 of the General Statutes of 1949, . . . *on any policy or certificate of any type or kind of insurance,* . . ." (Emphasis added.)

We think the expression emphasized is sufficiently broad to include a contract of insurance, even though it be temporary insurance evidenced by a binding receipt, as in the instant case.

Reviewing the evidence presented by the record in its entirety, we cannot say the trial court erred in finding that Pyramid refused without just cause or excuse to pay the full amount of life insurance due the appellee.

The trial court allowed $6,500 which it considered to be a reasonable attorneys' fee and in keeping with the provisions of 40-256, *supra.* In its memorandum allowing attorneys' fees, which consisted of three and one-half pages in the record, the trial court carefully reviewed all the matters which it took into consideration in arriving at the amount awarded. It took into consideration the time spent, the number of letters written, the number of long distance telephone calls made, miles traveled both by automobile and aircraft, together with out-of-pocket expenses disclosed by appellee's counsel including fees paid to expert witnesses and costs of copies of depositions and of the transcript of the trial. It further recognized that the appellee had entered into a contingent fee contract with her counsel, and the trial court examined such contract which it found to be fair and proper.

The trial judge acknowledged that the statute authorized "a reasonable sum as an attorney's fee;" that the provisions of any contingent fee contract between the appellee and her counsel should not be enforced against the insurance company under the provisions of the statute, but that there was nothing to prevent the court from considering the terms of such contingent fee contract in making its determination as to a reasonable fee in a case of this kind. The trial court further discussed considerations which entered into its determination of a fee allowance, including the skill with which counsel for the appellee presented the case, and thereupon made its award.

The court in making its allowance did not add the expenses of counsel to the fee allowance, but considered the amount and nature of the expenses as some evidence of the work and time involved as well as to the particular type of service being rendered.

Moreover, the trial court may apply its own knowledge and

professional experience in determining the value of services rendered. (*Wollard v. Peterson,* 145 Kan. 631, 66 P. 2d 375.)

We cannot say on the basis of the whole record presented the trial court erred in making the foregoing fee allowance to counsel for the appellee. In reviewing the matter we adhere to the rules heretofore stated in *Wolf v. Mutual Benefit Health & Accident Association,* 188 Kan. 694, 366 P. 2d 219.

Other points raised by the appellant in its brief have been analyzed in the light of our decision herein, and upon the basis of the record are found to be without sufficient merit to warrant further consideration.

The judgment of the lower court is affirmed.