No. 87,279
No. 87,981

NATIONAL INSPECTION AND REPAIR, INC., *Appellee*, v. VALLEY
FORGE LIFE INSURANCE COMPANY and CONTINENTAL
ASSURANCE COMPANY, *Appellants*, and EUGENE C. STRAUB,
*Appellee*.

(56 P.3d 807)

Opinion
filed November 1, 2002.

*Scott C. Nehrbass*, of Shook, Hardy & Bacon, L.L.P., of Overland Park, argued
the cause, and *Matthew J. Wiltanger*, and *Jerrod A. Westfahl*, of the same firm,
were with him on the briefs for appellants.

*Richard F. Hayse*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Topeka,
argued the cause, and *Phillip L. Turner* and *Dan E. Turner*, of Topeka, were with
him on the brief for appellee National Inspection and Repair, Inc.

*Eric A. Van Beber*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered,
of Overland Park, argued the cause for appellee Eugene C. Straub.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The central issue in this case is whether there was temporary insurance coverage on the life of William Thomas Gaines at the time of his death. Gaines died within the temporary coverage period set by the conditional premium receipt. When National Inspection and Repair, Inc., (NIR) demanded payment of $500,000 in life insurance on Gaines, Valley Forge Life Insurance Company and Continental Assurance Company (collectively known as CNA) denied coverage.

NIR sued CNA and Eugene Straub. Against CNA, NIR alleged breach of contract and, in the alternative, negligence. Against Straub, it alleged negligence or misrepresentation and acting without authority in failing to procure the insurance. CNA filed a cross-claim against Straub for improperly accepting the application and initial premium for Gaines. On cross-motions, the district court granted summary judgment in favor of NIR and against CNA. The district court dismissed CNA's cross-claim against Straub. CNA appeals. The district court's entry of summary judgment in favor of Straub was not appealed.

CNA filed separate notices of appeal from the entry of summary judgment and the dismissal of its cross-claim. Those appeals, 87,279 and 87,981, are consolidated for purposes of argument and decision under case No. 87,279. This court transferred the appeal from the Court of Appeals. K.S.A. 20-3018(c).

On appeal, CNA argues that the trial court erred in granting summary judgment in favor of NIR and in dismissing CNA's cross-claim against Straub.

The district court made findings of fact. On appeal, CNA contends, among other things, that summary judgment is precluded by a genuine issue of material fact whether NIR had notice before Gaines died that his life was not insured by CNA. CNA argues that summary judgment is not precluded because any notice NIR may have had of the lack of coverage on Gaines' life is, as a matter of law, insufficient to terminate temporary coverage. The district court made findings of fact, set out in numbered paragraphs, as follows:

1. The Defendant, Valley Forge Life Insurance Company, is an insurance company licensed to conduct business in the State of Kansas.

2. The Defendant, Continental Assurance Company, is an insurance company licensed to conduct business in the State of Kansas. The two companies are referred to collectively as CNA.

3. On or about September 18, 1998, William T. Gaines and Kenneth Burkhead both filled out applications for key man insurance. The plaintiff, NIR, was the intended beneficiary. Both William T. Gaines and Kenneth Burkhead filled out applications, which were accepted by defendant Straub.

4. On September 18, 1998, NIR issued check number 2409 to CNA in the amount of $653.36 with $211.72 being the amount due for Burkhead and $441.84 due for Gaines for life insurance coverage of $500,000 each, and delivered the check to defendant Straub.

5. Straub accepted the check, which was the premium payment for the first three (3) months for each policy and in return provided two "Conditional Premium Receipts" to NIR.

6. On September 19, 1998, Straub forwarded the applications to Financial Brokerage, Inc., which processed applications on behalf of CNA. Straub then went to China for 1 month.

7. Straub took premium money for the Gaines application although technically he should not have done so because Gaines had answered a question in section 20 of his application in the affirmative.

8. On September 24, 1998, Financial Brokerage, Inc., on behalf of CNA wrote to Straub and acknowledged receipt of the two applications.

9. The premium check from NIR was cashed by CNA on or about October 2, 1998.

10. On October 9, 1998, Financial Brokerage, Inc., wrote to Straub as a "STATUS UPDATE AS OF 10/08/98" and advised: "We may consider $234,500 as maximum for key man insurance. Please verify if the applicant was diagnosed with schizophrenia in August of 98? Thank you for your business."

11. On October 29, 1998, Financial Brokerage, Inc., again corresponded with Straub as a "STATUS UPDATE AS OF 10/28/98" and advised: "I have given the underwriter the medical information

regarding schizophrenia and we will continue to underwrite this case. I will contact you as soon as I have a decision. Thank you."

12. NIR's payment was for the first 3 months' premium for each policy. CNA does not dispute this fact, but it denies the payment was for any temporary, conditional or unconditional life insurance contract.

13. Straub did not disclose that this insurance was contingent in any way and in fact stated that upon the acceptance of the check the company would be covered and if the individuals died the next day that the insurance would be in effect. Defendant CNA does not dispute that the statement may have been made but denies it was valid or that Straub had authority to make it or that it would give rise to a temporary insurance contract.

14. Gaines died unexpectedly on November 15, 1998.

15. Straub wrote in a letter to the Kansas Insurance Commissioner on April 22, 1999: "I called Financial Brokerage, Inc., promptly upon notification by phone from Mr. Kenneth Burkhead, Jr. that Mr. Gaines had died during the night." This fact is not disputed by CNA, but it denies that prompt notification has any effect to create temporary, conditional or unconditional coverage.

16. On November 23, 1998, 8 days after Gaines' death, CNA, through its agent Financial Brokerage, Inc., notified Straub by letter that a policy of insurance was being issued for Burkhead with an annual premium payment of $622.50.

17. After Gaines died, NIR contacted CNA on December 30, 1998, and on January 21, 1999, attempting to collect on the insurance policy. NIR, through its counsel, notified CNA of its demand to collect the life insurance proceeds for the policy which insured Gaines in the amount of $500,000 at the time of his death on November 15, 1998.

18. In a letter dated January 8, 1999, CNA attempted to refund the original premium amount by issuing a refund check in the amount of $653.36. The letter states that "any coverage that may have been provided under our Conditional Premium Receipt no longer applies." This letter was date stamped by the post office, January 11, 1999. CNA denies that the letter expressly or impliedly

creates temporary, conditional or unconditional insurance coverage.

19. NIR refused to cash the refund check.

20. In a letter to the Kansas Insurance Department, CNA on May 7, 1999, admitted: "Although the money was refunded under the partner file, no notification was sent to Mr. Gaines that coverage did not exist."

21. CNA has refused to pay NIR the $500,000 coverage upon the death of Gaines, and NIR contends that the money is now due and owing under the application and conditional receipt.

22. To help in its business operations, NIR hired Straub as an advisor on business related matters.

23. David Price, President of NIR, also declared Straub to be NIR's insurance representative.

24. In his capacity as an advisor for NIR, Straub suggested to Price that NIR should purchase key man insurance on a couple of its employees.

25. Straub contacted Financial Brokerage, Inc., to solicit key man insurance on behalf of NIR. Financial Brokerage, Inc., responded by sending Straub information on three companies.

26. Price, on behalf of NIR, selected CNA.

27. After CNA was selected, Straub sought solicitor or producer status with CNA in order to receive the commission from the sale of key man insurance to NIR.

28. On or about September 29, 1998, Financial Brokerage, Inc., contacted Bammes, who had been designated by Straub to act for him while he was in China, to inform him that premium money could not be accepted with Gaines' application and to discuss potential remedies. NIR contends that this fact is inadmissible hearsay and should not be considered.

29. Financial Brokerage, Inc., also informed Bammes that, if Gaines were to be covered, he could only be covered for $234,500 due to his salary range. Bammes conveyed this information to Straub, but not to NIR.

30. Bammes told Financial Brokerage, Inc., to apply all the premium to Burkhead's application and to reapply $441.84 to Gaines' file if a policy was issued on his life. NIR contends that this fact is

inadmissible hearsay and should not be considered. The district court found that there was not sufficient competent evidence to support a finding that NIR was informed before Gaines' death of the communications between Bammes and Financial Brokerage, Inc.

31. Until receiving CNA's letter of January 8, 1999, NIR had no direct knowledge from CNA of its intent not to insure Gaines.

32. CNA retained the premium and was in possession of it at the time of Gaines' death.

33. Gaines died within the 90-day period for which any coverage was in effect through the conditional premium receipt.

We first consider whether the trial court erred in granting summary judgment in favor of NIR.

The issue, as seen by the district court, is whether a person is insured if that person dies after an application for life insurance has been submitted and an initial premium payment has been exchanged for a receipt, but before the period provided for temporary coverage has expired and before a policy of life insurance has been issued or refused. According to the district court, the general rule governing this circumstance was stated in *Service v. Pyramid Life Ins. Co.*, 201 Kan. 196, Syl. ¶ 7, 440 P.2d 944 (1968):

> "The provisions of a binding receipt issued for payment of the first premium upon application for life insurance, in accordance with the facts and conditions more particularly stated in the opinion, are construed as providing temporary insurance protection until such time as the insurer has considered the application and announced its determination to accept or reject the risk, and the insurer cannot terminate the risk so assumed unless the insured is notified in his lifetime that his application was rejected."

In *Service*, the regional manager for the insurance company met with Zelma and Gerald Service and took an application and a premium check for life insurance on Gerald. The manager told Zelma that Gerald was covered upon payment. In reliance, the Services allowed two other term life insurance polices to expire. Before the insurance company had notified the Services whether it would insure Gerald, he died in an automobile accident. The insurer denied coverage; Zelma Service successfully sued for the full amount of insurance applied for.

With regard to receipts for first premium payments, temporary coverage, and the practices of life insurance companies, the court in *Service* expressed the following view:

"It is the practice of many life insurance companies to state in their applications that the contract of insurance shall not take effect until the application has been approved by the company, the first premium paid by the applicant, and the policy delivered. Where this is the situation a period intervenes between the signing of the application by the applicant and the delivery of the policy. During this period no money has been advanced to the insurance company, and no insurance is in effect. This interval, of a few days to several weeks, depending upon the time consumed in investigation and physical examination of the applicant, in passing upon his application at the home office, and in the traveling of the application and policy to and from the home office, is undesirable from the point of view of the insurer as well as the applicant. The disadvantage to the applicant consists in the fact he is not covered by insurance during this period, while the disadvantage to the insurer consists in the fact that during this period the applicant possesses the power to revoke the offer made in his application. This disadvantage is a real one as far as the insurer is concerned, because the applicant may decide to exercise his power, either because he chooses not to carry any insurance at all, or because he chooses to purchase it from a rival company. In that event the company suffers to lose what it has expended for the investigation and medical examination of the applicant, aside from the loss of business itself.

"To alleviate this situation insurance companies have seized upon the idea of issuing binding receipts to the applicant upon the payment of the first premium. These binding receipts, or conditional receipts, as they are sometimes called, usually contain a provision to the effect that the insurance shall be considered as in force from the date of the receipt, or the date of the medical examination, provided the application is approved and accepted at the home office of the insurer.

. . . .

"The issuance of these binding receipts effectively does away with the disadvantage threatening the insurer. The applicant to whom the binding receipt is issued feels contractually obligated to perform, and it serves to give the insurer the use of premium money at the earliest date possible. It further offers a selling point of which no agent fails to make the utmost in his talks with prospective customers." 210 Kan. at 209-10.

## With regard to courts' handling of the binding receipts, the court observed:

"There is a great confusion of authority as to the effect to be given such receipts. Because of the similarity of wording usually found in them, attempts have been made to generalize their operation. If these apparently conflicting authorities are

examined, however, it becomes clear that these receipts are not capable of general treatment, but must be individually interpreted to give them the effect which the parties intended them to have in each case. The fundamental question is: What was their intention?" 201 Kan. at 211.

Thus, the issue was whether the receipt given to Zelma Service in exchange for her initial premium payment indicated "an intention to create temporary insurance coverage for the time during which the approval of the application was pending?" 201 Kan. at 212.

The receipt given to Zelma Service stated:

" 'It is understood and agreed that the payment referred to on the reverse side of this receipt is made and accepted subject to the following conditions:

'1. That if the Company at its Home Office after investigation shall be satisfied that *on the date hereof, or on the date of the medical examination* for such insurance, whichever is later, each person proposed for insurance was *insurable* and entitled under the Company's rules and standards to insurance on the plan and for the amount applied for at the Company's published rates corresponding to the age of each person proposed for insurance, the insurance protection applied for shall by reason of such payment [except as otherwise provided in item (16) of the application] take effect from the date hereof or from the date of such medical examination, whichever is later. In any event, *the amount of insurance becoming effective under the terms of this receipt is limited to the extent that in the event of the death of the Proposed Insured, the total liability of the Company shall not exceed $250,000 inclusive of life insurance and accidental death benefit in force with the Company on the date of the application.* If less than the full first premium has been paid, *such insurance protection shall nevertheless become effective on said date* but shall be deemed temporary only and to expire at the end of the period for which the amount tendered hereunder would provide such insurance on a pro rata basis.

'2. That if any check, draft or money order given in payment of the premium is not paid on presentation, this receipt shall be void.

'3. That *if said application is not approved and accepted by the Company* within sixty (60) days from the date hereof, then insurance applied for shall not become effective, and the amount tendered shall be returned. Any delay in the return of the amount tendered shall not be construed as approval of the application.' (Emphasis added.)" 201 Kan. at 211.

The court concluded that the insurance company "accepted the liability for insurance created by the preliminary agreement in the form of a binding receipt of which it had not been divested by rejection of the application." 201 Kan. at 216. Stating that it was giving effect to the intention of the parties, the court held that

temporary insurance was in force on the life of Gerald Service at the time of his accidental death. 201 Kan. at 215-16.

Despite it being apparent that *Service* was the basis for the district court's decision in the present case, CNA does not mention *Service* in its opening brief and contends that the district court applied *Tripp v. The Reliable Life Insurance Co.*, 210 Kan. 33, 499 P. 2d 1155 (1972). CNA attacks the district court's ruling on the ground that *Tripp* was expressly overturned in *Thomas v. Thomas*, 250 Kan. 235, 824 P.2d 971 (1992). CNA's argument borders on the disingenuous and is without merit.

In *Tripp*, as in *Service*, the application for insurance included a provision for a certain number of days in which the company could issue or decline to issue a policy. In *Tripp*, unlike in *Service*, the stated period was over before the applicant died. In *Tripp*, the application provided:

" '. . . (2) The Company shall have sixty (60) days from the date of receipt of the application at its Home Office in Webster Groves, Missouri (which is agreed to be a reasonable period) to determine the insurability of Proposed Insured on the basis on which application is made or on another basis. If the policy is not received by the undersigned(s) within that period the application will be deemed to have been declined by the Company. . . .' " 210 Kan. at 34.

The receipt given for the initial premium stated:

" '. . . The insurance under the policy for which application is made shall be effective on date of this receipt or the date of completion of the medical examination (if, and when required by the Company), whichever is the later date, if in the opinion of the authorized Officers of the Company at its Home Office in Webster Groves, Missouri, the Proposed Insured is insurable and acceptable for insurance under the rules and practices on the plan of insurance. . . .

'Company shall have 60 days from date of application to consider and act upon the application. Failure of the Company to offer a policy within such 60 days shall be deemed a declination.' " 210 Kan. at 34.

Refusing to distinguish *Service* on the ground that Service died within 60 days of application but Tripp died 45 days after the 60 days had passed, the court stated that the "reasoning in *Service*, supporting the theory of temporary insurance, is consistent with

an extension of the doctrine of temporary insurance until the company acts upon the application." 210 Kan. at 38. The court held:

"The only reason for failure to return the premium at the end of the sixty days would be that the company was still contemplating issuing the policy. We cannot support a rule which would permit an insurance company to make a decision on an application after the insured's death. We conclude under the facts disclosed in this record that when an application for life insurance is made and the company receives the initial premium and issues a receipt therefor, a policy of temporary insurance is created and said policy of temporary insurance continues in effect until the insurance company declines the application, notifies the insured, and returns the premium, notwithstanding the provisions of the application and the receipt to the contrary." 210 Kan. at 38.

In *Thomas*, as in *Tripp*, an applicant for life insurance died after the consideration period had expired. The *Thomas* court, 250 Kan. at 244, expressly overruled *Tripp* and announced this new rule:

"When a conditional receipt for life insurance states clearly and unequivocally that if no insurance policy is issued to the applicant within a specified period the application shall be deemed to have been denied by the company and there is no insurance beyond the specified period, the contract expires by its own terms." 250 Kan. 235, Syl. ¶ 1.

The receipt given to Richard Thomas when he applied for life insurance and paid the initial monthly premium stated that if within 45 days from issuance of the receipt a policy has not been issued to the applicant, the application would be deemed to have been declined by the insurance company. 250 Kan. at 236-37. When Thomas died nearly 6 months after applying, the insurance company had not issued a policy. Applying the new rule, the court determined that Thomas was not insured at the time of his death.

The court distinguished *Tripp* from *Service*:

"In *Service*, the insured died during the conditional receipt period, making it completely distinguishable from *Tripp*. From our consideration of all the cases, we conclude *Tripp* should be overruled. The conditional receipts in *Tripp* and in this case state clearly and unequivocally that if no insurance policy is delivered to the applicant within a specified period, there is no insurance. Thus, the contract expired by its own terms. Such does not represent a new principle of law. Most contracts have termination dates. We are mindful of the rule that contracts drafted by one of the parties should be strictly construed against the party who drafted it. [The insurance company] drafted this contract, but because it is clear and unambiguous it requires no construction by this court. *Fast v. Kahan*, 206 Kan.

682, Syl. ¶ 2, 481 P.2d 958 (1971). Thus, the strict construction rule is inapplicable.

"It is a cardinal rule of construction that courts will not rewrite a contract by construction if it is clear and unambiguous. See *Havens v. Safeway Stores*, 235 Kan. 226, 231, 678 P.2d 625 (1984). This contract falls into that category. Richard applied for a policy of life insurance. He was issued 45 days of coverage by the conditional receipt. His premium paid for the coverage. If [the insurance company] desired to terminate the temporary coverage before the 45 days expired, it was required to notify him and return his premium. If, however, it did not so notify him, he received 45 days of insurance, but no more, with his premium used for that coverage. In this case the insured died after the coverage under the conditional receipt expired and, therefore, [the insurance company] is not liable. We hereby overrule *Tripp v. The Reliable Life Insurance Co.*, 210 Kan. 33, 499 P.2d 1155 (1972)." 250 Kan. at 244.

The district court found in the present case that Gaines died within the 90-day period for which any coverage was in effect through the conditional premium receipt. In that narrow respect, the present case falls within the factual pattern of *Service* rather than *Thomas*. On the whole, the principles announced and applied in both *Service* and *Thomas* guide the court's consideration of the question of temporary insurance coverage in the present case.

CNA asserts that, unlike the Services who expected temporary and permanent coverage on Gerald's life and relied on the assurances of an authorized agent that he was and would be insured, NIR had no expectation that Gaines would be insurable and did not rely on his being insured. With this argument, CNA attempts to transform a contract action into an equitable matter. Although there is discussion in *Service* of the equitable concerns for expectations and reliance, at bottom it is a contract case and the language of the application form and the receipt, read according to applicable rules of construction and in the context of the insurance industry's practice of taking an initial premium with the application, govern. The district court read *Service* too broadly in concluding that the rule of that case alleviates the need for a contractual analysis of the application and receipt.

Not mentioned in the parties' submissions on the motions for summary judgment or in the district court's memorandum decision and order is K.S.A. 40-451. The *Thomas* opinion was filed on Jan-

uary 17, 1992. During the 1992 legislative session, an act relating to life insurance and declination of it was passed, and it appears in the statute book as K.S.A. 40-451. The statute provides:

"(a) When an application for an individual life insurance policy and an initial premium therefor has been received by an insurance company or agent acting on behalf of such company, the coverage for which application is made shall, subject to the limitations in subsection (b), be deemed to be temporarily in effect until the insurance company or agent has, in the event of an adverse underwriting decision, as defined in K.S.A. 40-2,111 and amendments thereto, notified in writing the applicant of such adverse underwriting decision and returned any unearned premium in accordance with K.S.A. 40-2,112 and amendments thereto.

"(b) When an application for an individual life insurance policy and an initial premium therefor has been received, the receipt for the premium shall be in writing and may:

(1) Exclude coverage if the proposed insured commits suicide;

(2) void coverage if the application contains material misrepresentation or is fraudulently completed;

(3) limit the coverage otherwise provided by subsection (a) by specifying for each proposed insured the amount and type of temporary coverage granted; and

(4) void coverage if a check or draft received in payment of the premium is not honored for payment when presented.

"(c) When an application for an individual life insurance policy and an initial premium therefor has been received, the receipt for the premium shall be in writing and provide for a refund of any unearned premium pursuant to K.S.A. 40-2,112 and amendments thereto."

CNA argues that K.S.A. 40-451, which on its face covers applications for individual life insurance, does not apply to the key man insurance policies that NIR attempted to purchase on the lives of two of its employees. CNA's contention seems to be that the beneficiary of a life insurance policy must be an individual rather than a corporation in order for the policy to be for "individual life insurance" within the meaning of the statute. The insurer cites no authority for its position. Nor does it offer any instances of insurance policies carrying labels that reflect the beneficiary rather than the insured. The legislature used the term "individual life insurance" to distinguish individual policies from group life insurance policies, in which insurance is offered to members of a group, such as the employees of a business, under a master policy between the insurer and the employer. See K.S.A. 40-433.

K.S.A. 40-451 has not yet been considered by a Kansas appellate court. The statute was construed and applied by a federal district court in *Stauffer v. Jackson Nat. Life Ins. Co.*, 75 F. Supp. 2d 1271 (D. Kan. 1999). Darrell Stauffer applied to purchase a $250,000 life insurance policy and delivered a check for the quoted premium by December 6, 1993. On December 27, 1993, the defendant informed Stauffer that it could not issue the policy applied for except at a greater premium than quoted by its agent. On December 30, 1993, Stauffer paid the additional premium and the insurance company delivered a policy to him. The policy states that both the policy date and the issue date are December 28, 1993. By the terms of the policy, if the insured died as a result of suicide "within two years of the issue date, the amount payable by defendant will be equal to the premiums paid" rather than $250,000. 75 F. Supp. 2d at 1273. The insured died by suicide on December 13, 1995. The federal district court stated that the issue before it was "when the suicide and contestability provisions of the policy began to run— at the time Darrell Stauffer completed his application (December 6, 1993), or at the 'issue date' listed on the first page of the policy (December 28, 1993)." 75 F. Supp. 2d at 1273.

The receipt that Stauffer received in return for his initial premium payment stated in part:

"INTERIM INSURANCE RECEIPT

"Any reference in this Interim Insurance Receipt to a policy or an amount applied for refers to the policy and amount applied for on the application to which this Interim Insurance Receipt was originally attached and bears the same number.

"WHEN COVERAGE BEGINS

"This receipt provides insurance coverage in the amount described in the LIMITS OF COVERAGE section if a check or draft for the first full premium, for the plan and mode applied for, is submitted with the application to which this Interim Insurance Receipt was attached and the check or draft is honored for payment.

"EFFECTIVE DATE

"The EFFECTIVE DATE of the Interim Insurance for each Proposed Insured shall be the date of this receipt.

"LIMITS OF COVERAGE—$25,000

"Interim Insurance based on this receipt, and all other receipts issued by the

Company covering the life of any Proposed Insured, shall not exceed $25,000 or the amount applied for, WHICHEVER IS LESS. . . . No Interim Insurance shall be payable if a Proposed Insured dies by suicide.

### "DUTIES OF THE PROPOSED INSURED(S)

"If the health of any Proposed Insured, or any answers or statements in the application or in any medical examination, report or application supplement changes prior to the delivery of the policy; THE PROPOSED INSURED MUST SO INFORM THE COMPANY IN WRITING. The Company will then determine whether to issue a policy . . . .

### "WHEN COVERAGE TERMINATES

"Interim insurance shall terminate automatically on the earliest of:

"1. The date the policy, as applied for, goes into force, which is the date the policy is delivered and any additional premium paid; or

"2. When a Proposed Insured refused to accept delivery of a policy which has been issued as applied for.

"THIS RECEIPT IS NOT A BINDER . . . ." 75 F. Supp. 2d at 1272-73.

The federal district court examined three Kansas statutes, K.S.A. 40-451, K.S.A. 40-420, and K.S.A. 40-2,112(d). In addition, the federal district court quoted *Missouri Medical Ins. Co. v. Wong*, 234 Kan. 811, 676 P.2d 113 (1984): "In Kansas, 'where a policy of insurance is issued to an insured in compliance with the requirement of a statute, the pertinent provisions of the statute must be read into the policy, and no provisions of the policy in contravention of the statute can be given effect.' " 75 F. Supp. 2d at 1274-75. Reasoning as follows, the court concluded that the 2-year period expired before the insured's death by suicide:

"Under the provisions of K.S.A. 40-451 and K.S.A. 40-2112, the coverage applied for was 'in effect' with the completion of the application and receipt of the initial premium. The coverage remained in effect, although it was limited, per the interim insurance receipt and K.S.A. 40-451(b)(1) & (3), pending the underwriting decision. None of the limitations described in K.S.A. 40-451(b) or in the interim receipt in this case, suspend the running of the two-year period in the policy when payment in case of suicide is restricted. With the counter-offer of coverage for an increased premium, full coverage was in effect under the terms of the policy for which the application was made. K.S.A. 40-2,112(d)(1)(B). When the counter-offer was accepted, the policy's full terms remained in effect.

"To argue that the policy was not in effect for purposes of the suicide clause until the counter-offer was accepted and the additional premium was received, is contrary not only to the above-cited provisions, but also to the provisions of K.S.A.

40-420(2) which require that a policy be incontestable after it has been 'in force during the lifetime of the insured for a period of not more than two years from its date.' Under the Kansas statutes, the policy was 'in force,' if temporarily limited, on December 6, 1993. Extending the period of the suicide clause to the date of issue listed on the policy when it was delivered—or 23 days after the interim insurance receipt date—would in effect abrogate the statutory deadline for contestability. See *American National Insurance Company v. Motta*, 404 F.2d 167, 169 (5th Cir. 1968).

"At the very least, the application of the Kansas statutes to the policy and interim receipt in question creates an ambiguity. Of course, ambiguities must be decided in favor of the insured. See *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 840 P.2d 456, 459 (1992). Kansas statutes require that various provisions of the policy be in effect at the time of application and receipt of the initial premium. This includes the running of the two-year period before which the policy is incontestable. K.S.A. 40-420(2). Contrary to defendant's contention there is no express provision in the law which creates an exception to this requirement. When the policy makes reference to an 'issue date' for the running of the two-year period for contestability or for a limited recovery in the case of suicide, but the Kansas statutes indicate a different effective date for the policy and for the period of contestability, the policy is ambiguous.

"[W]e agree with plaintiff that the case law is fact-specific. We further agree with plaintiff that this case turns on the provisions of the Kansas statutes. In our opinion, these statutes require finding that when the application and initial premium were received, the two years started to run during which the recovery in the event of suicide was limited to premiums paid. The two-year period expired before Darrell Stauffer's death." 75 F. Supp. 2d at 1275.

Although the timing and circumstances of the insured's death in *Stauffer* are different from those in the present case, the essential issue in both cases is when the policy became effective. Reading the statutory provisions into the policy and resolving resulting ambiguity in favor of the insured, both as required by Kansas law, the federal district court concluded that the effective date for the Stauffer policy was when the application and initial premium was received by the insurer.

In the present case, the conditional premium receipt that was given in return for the initial premium payment for Gaines states in part:

"IMPORTANT: This receipt does NOT automatically create interim insurance coverage. NO INSURANCE IS EVER IN FORCE under this receipt until after ALL of its conditions are met.

" NO AGENT OF THE COMPANY AND NO BROKER IS AUTHORIZED TO ALTER OR WAIVE ANY CONDITIONS OF THIS RECEIPT.

"I. CONDITIONS REQUIRED FOR INSURANCE COVERAGE TO GO INTO EFFECT

"It is understood and agreed that ALL of the following conditions must be COMPLETELY satisfied for insurance coverage to take effect:

'A. The amount paid in exchange for this Receipt must equal at least the Minimum Premium for the Quarterly Mode (for Universal Life only) or 1/12 of the annual premium (for all other plans of insurance) for the policy applied for in the application.

'B. The application and all medical underwriting requirements specified by the company rules and standards must be completed.

'C. On the Underwriting Date, as defined in Section II below, both Proposed Insureds 1 and 2 must be a standard risk according to the Company's underwriting rules and standards for the plan and amount of insurance applied for in the application.

"II. EFFECTIVE DATE OF CONDITIONAL COVERAGE

"If all the Conditions in Section I are COMPLETELY satisfied, then insurance coverage will begin on the LATER of the following dates:

'A. The Underwriting Date, or

'B. The Policy Date, if any, requested in the application.

. . . .

"IV. LIABILITY NOT ASSUMED

"If the Company determines that on the Underwriting Date, as defined in Section II, that either Proposed Insured 1 or 2 is not a standard risk according to the Company's underwriting rules and standards for the plan and amount of insurance applied for in the application and if either Proposed Insured 1 or 2 dies before the Underwriting Date, then the Company assumes NO liability under this receipt and application for life insurance.

"V. TERMINATION OF COVERAGE

"Any coverage which takes effect through this Receipt will terminate on the EARLIEST of the following dates:

'A. Ninety (90) days after the date of this Receipt.

'B. The expiration of the period for which Minimum Premium has been paid (for Universal Life only) or the fraction of one year that the payment made bears to the annual premium for the policy applied for (for all other plans of insurance).

'C. The date the policy goes into effect.

'D. The date that the Company determines that either Proposed Insured 1 or 2 are not entitled under the Company's underwriting rules and standards for insurance on the plan and amount of insurance applied for. In that case no insurance becomes effective and the amount paid will be returned to the Owner.

ANY DELAY IN RETURNING THE AMOUNT PAID WILL NOT BE CON-
STRUED AS APPROVAL OF THE APPLICATION.

"If coverage under the receipt terminates as provided in Section V above, any
policy issued by the Company will not take effect until, during the lifetime of
Proposed Insured 1 and 2, both the policy is delivered to the Owner and the first
premium is paid, and then only if there has been no change in the health of either
the Proposed Insured 1 and 2 since the date of this receipt."

The general rule of K.S.A. 40-451(a) is that, when an insurance
company receives an application and an initial premium, coverage
is deemed to be temporarily in effect. None of the exceptions and
limitations of subsection (b) seem to apply in this case. Hence, the
general statutory provision is to be read into the conditional pre-
mium receipt for Gaines' premium. The terms of the receipt, in
particular the bold disclaimer—"This receipt does NOT automat-
ically create interim insurance coverage. NO INSURANCE IS
EVER IN FORCE under this receipt until after ALL of its con-
ditions are met."—conflict with the statutory provision. As the fed-
eral district court observed, at the very least, the application of the
statutory provisions to the interim receipt creates an ambiguity. 75
F. Supp. 2d at 1275. Where there is an ambiguity, the construction
most favorable to the insured must prevail. *Brumley v. Lee*, 265
Kan. 810, 812, 963 P.2d 1224 (1998).

Also conflicting with the statute is the receipt provision that
would delay the effective date of conditional coverage beyond the
statutory provision for coverage upon the insurer's receipt of the
application and initial premium. The statutory provision prevails
here, too.

With regard to the insurer's receipt of an initial premium, CNA
takes a stab at arguing that it never received an initial premium for
Gaines because the premium eventually was applied to Burkhead's
application. In this regard, the district court found that on Septem-
ber 18, 1998, the agent took the applications of Burkhead and
Gaines along with a check for the amount of the combined Burk-
head/Gaines initial premiums. The statute provides that coverage
for Gaines is deemed to be temporarily in effect upon that trans-
action. K.S.A. 40-451(a). There is no merit to the argument that it
should be deemed never to have received an initial premium for
Gaines.

That the initial premium for Gaines eventually was applied to Burkhead requires further consideration. The district court found, while noting the objection of NIR, that on or about September 29, 1998, Financial Brokerage, Inc., contacted Bammes, who had been designated by Straub to act for him while he was in China, to inform him that premium money could not be accepted with Gaines' application and to discuss potential remedies. Financial Brokerage, Inc., also informed Bammes that if Gaines were to be covered, he could only be covered for $234,500 due to his salary range. Bammes told Financial Brokerage, Inc., to apply all the premium to Burkhead's application and to reapply $441.84 to Gaines' file if a policy was issued on his life. CNA retained the premium and was in possession of it at the time of Gaines' death. Bammes passed the communication along to Straub, but not to NIR. It was not until January 8, 1999, that CNA wrote to NIR that it did not intend to insure Gaines. CNA sent a refund check in the amount of $653.36 along with the January 8, 1999, letter to NIR.

Kansas statutes provide that the coverage will be deemed to remain in effect until the applicant has been notified of an adverse underwriting decision in writing accompanied by the return of the unearned premium. K.S.A. 40-451(a); K.S.A. 40-2,112(d)(1). In this case, Gaines never was notified in writing of an adverse underwriting decision and NIR was not notified in writing until after Gaines' death. Thus, coverage is deemed to have remained in effect until after Gaines' death.

Financial Brokerage, Inc.'s notice to Bammes on September 29, 1998, that premium money could not be accepted with Gaines' application apparently was on account of Gaines' affirmative answer to section 20 of the application. It asks the applicant to check "yes" or "no" to each of two questions. Gaines answered "yes" to the following question in section 20: "In the past 90 days, has any person proposed for insurance been admitted to a hospital or other medical facility, been advised to be admitted, contemplated surgery, or had surgery performed or recommended?" He added this explanation: "Motorcycle accident June 12 Stormont Vail Hosp., Topeka, KS right leg: fachiotomy (fasciotomy?) to relieve swelling — broken right ankled [sic] — all healed." Beneath the questions

in section 20 is this statement: "If either question in this section is answered 'Yes' or left blank, a premium payment cannot be accepted with this application and any conditional receipt is void."

CNA contends that Gaines' affirmative answer in section 20 renders the conditional premium receipt *void* and that the entry of summary judgment must be reversed because it was made on the basis that the receipt was merely *voidable*. According to CNA, the significance of the void receipt is that it, unlike a voidable writing, cannot be acquiesced in or validated or ratified by any subsequent conduct of the parties. We note that based on Gaines' explanation of his answer to section 20, more than 90 days had passed since his accident. Thus, on its face, yes was an incorrect answer. Nonetheless, K.S.A. 40-451 controls once an application and initial premium have been received for an individual life insurance policy. In this case, despite Gaines' affirmative answer, his application and premium were accepted.

Coverage was deemed to be temporarily in effect for Gaines under K.S.A. 40-451(a), and none of the exceptional circumstances identified in 40-451(b) seems to apply. Subsection (b)(1) excludes coverage in the event of suicide, (b)(2) voids coverage if the applicant makes a material misrepresentation, and (b)(4) voids coverage if a check or draft for the premium payment is not honored. There is no question that none of these applies. Subsection (b)(3) provides that the receipt may limit coverage "by specifying for each proposed insured the amount and type of temporary coverage granted." With the number of purported conditions and limitations contained in the conditional premium receipt, exception (b)(3) requires some thought. Scrutiny of the receipt, however, reveals only one instance where CNA limits the coverage by specifying the amount and type of temporary coverage granted, as contemplated in K.S.A. 40-451(b)(3). Section III states:

"The liability of the Company under this Receipt and application for life insurance and accidental death benefits will not exceed $1,000,000 reduced by (1) any insurance issued by the Company on the life of either Proposed Insured 1 or 2 within 90 days preceding the date of this receipt and (2) by any death benefit payable under all other Receipts and applications currently pending with the Company."

Section III has no application to the circumstances of this case.

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Bergstrom v. Noah*, 266 Kan. 847, 871, 974 P.2d 531 (1999).

CNA argues that the district court's entry of summary judgment in NIR's favor was improper because genuine issues of material fact existed. In particular, CNA contends that there is a dispute about whether it notified the applicant and returned the initial premium for Gaines. CNA refers to evidence that Financial Brokerage, Inc., notified Bammes that Gaines was uninsurable and Bammes directed it to apply the Gaines portion of the premium check to Burkhead. That evidence raises a legal issue rather than a material fact issue. Nevertheless, the argument is made without reference to K.S.A. 40-451, which requires written notice. CNA does not contend that either NIR or Gaines received *written* notice of an adverse underwriting decision before Gaines' death. Hence, if the statute's requirement of written notice is given strict effect, unwritten notice is irrelevant for summary judgment purposes.

Finally, at oral argument, counsel for the appellant argued that the maximum amount of coverage under the premium receipt was $234,500. The basis for that argument was the notice given to Bammes that due to Gaines' salary, the maximum coverage may be only $234,500. The fallacy in appellant's argument is its failure to comply with K.S.A. 40-451. It gave no written notice to NIR limiting the amount of coverage under the premium receipt, nor did it return the unearned premium resulting from the reduction in coverage. Accordingly, at the time of Gaines death, the amount of coverage provided in the premium receipt was $500,000.

The district court did not err in granting summary judgment to NIR.

We next consider if the trial court erred in dismissing CNA's cross-claim against Straub.

Initially we note that the district court's procedure was somewhat irregular in "dismissing" CNA's cross-claim against Straub.

In January 2001, CNA filed a motion for leave to file a cross-claim against Straub, and he filed suggestions opposing the motion. CNA filed its cross-claim, and Straub filed his answer to it in February 2001.

On April 26, 2001, when the district court filed its memorandum decision and order granting summary judgment in favor of NIR and against CNA, the trial judge was unaware that CNA's cross-claim had been filed and answered. Included in the memorandum decision and order was a denial of CNA's motion for leave to file the cross-claim.

On May 25, 2001, CNA filed a notice of appeal from the entry of summary judgment and the district court's denial of its motion to file a cross-claim against Straub.

Later, the district court prepared a letter decision, which states that at the time of its memorandum decision and order the district court was unaware that the cross-claim had been filed and answered. CNA's motion for leave to file the cross-claim was granted in January, but the district court was not aware of it because "the order allowing the cross-claim was not journalized as required in the January 30th minutes." The district court further stated that, upon reviewing the cross-claim, it found "on the undisputed facts submitted," that the cross-claim should be dismissed because, as a matter of law, Straub was not the proximate cause of CNA's loss. The legal principle upon which the district court based its decision is that on theories of contract, negligence, and indemnification a principal is not entitled to indemnification unless the agent's error is the proximate cause of the principal's loss. The trial court cited no authority.

Although the letter decision was not file-stamped until June 14, 2001, it appears that it may have been mailed to parties on the typed date and received by them on May 30, 2001. A timetable in CNA's brief gives May 30, 2001, as the date for the letter decision. In any event, CNA filed another notice of appeal on July 10, 2001, appealing from the letter decision, which dismissed CNA's cross-claim against Straub.

The parties do not complain on appeal of any irregularity with regard to the trial court's or the appellate court's jurisdiction.

CNA complains that it was not given an opportunity by the district court to brief or argue the question whether the cross-claim should be dismissed. It appears from the district court's letter decision, however, that the disposition was made after the matter had been discussed with counsel. The trial judge stated that on May 25, 2001, he "instituted a telephone conference among all parties" to discuss the matter of the cross-claim. The trial court further stated that upon reviewing the cross-claim and undisputed facts, which we can only presume were those submitted by the parties with their motions for summary judgment, it had determined that the cross-claim should be dismissed as a matter of law. Thus, disposition of the cross-claim was based on materials prepared and presented to the trial court by the parties.

As CNA notes, because matters outside the pleadings were presented to and considered by the court, the disposition will be treated as an entry of summary judgment. The trial court was required to resolve all facts and inferences that reasonably may be drawn from the evidence in favor of CNA. On appeal, we apply the same rule. Summary judgment is appropriate where there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law.

Relative to this issue, the district court made its chronological findings of fact stated earlier in this opinion.

CNA's theory of liability against Straub was that he was not authorized to take Gaines' application or the initial premium for his coverage, and, in fact, Straub was expressly unauthorized to do so. Straub violated the terms of his producer contract with CNA by doing so, he negligently performed his duties as a CNA agent by doing so, and he had a duty to reimburse CNA for any loss it suffered as a result of his improper conduct. Straub asserted the affirmative defense of ratification, and, as we have seen, the district court made a number of findings of fact that are relative to the question of CNA's ratification of Straub's conduct. Although the district court phrased its ruling in terms of the lack of proximate causation rather than ratification, that approach seems to have been a way of saying that ratification cut off causation. On appeal, CNA argues that it did not ratify Straub's action.

Also on appeal, CNA states that the district court relied on *Hays v. Farm Bureau Mut. Ins. Co.*, 225 Kan. 205, 589 P.2d 579 (1979), and *Foley Co. v. Scottsdale Ins. Co.*, 28 Kan. App. 2d 219, 15 P.3d 353 (2000). CNA would factually distinguish *Hays* and *Foley Co.* Straub contends that the pertinent facts of this case and *Foley Co.* are parallel and that the principles of agency law that controlled the court's decision in *Foley Co.* control in the present case as well. The Court of Appeals in *Foley Co.* found *Hays* factually dissimilar in that the insurance company in that case had not ratified the agent's actions. 28 Kan. App. 2d at 227-28.

*Foley Co.* arose from a construction accident in which John Bryant was killed. Judgment was entered against Foley, the general contractor, in an action by Bryant's survivors. Foley and its insurance carrier sued a subcontractor and its insurance carrier, Scottsdale, and an insurance broker, CLC, for partial indemnification of amounts paid in the Bryant litigation. In Foley's suit for indemnification, the trial court entered judgment against Scottsdale. On Scottsdale's cross-claim against CLC and several other third-party defendants alleging that they were not authorized to add Foley as an additional insured on the subcontractor's policy, the trial court entered summary judgment against Scottsdale on account of its ratification of CLC's allegedly unauthorized acts.

On appeal, Scottsdale quarreled with the district court's finding that it ratified the third-party defendants' actions. In the alternative, Scottsdale argued that its failure to repudiate the third-party defendants' actions did not relieve the third-party defendants from their breach of contract.

With regard to the question whether Scottsdale ratified the third-party defendants' actions, the Court of Appeals stated:

"Under agency law, once a principal knows of an agent's unauthorized actions, it cannot sit back and see if it will benefit or suffer from the agent's actions. Instead, a principal who receives notice of an unauthorized act of an agent must promptly repudiate the agent's actions or it is presumed that the principal ratified the act. Ratification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent. *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 304-05, 510 P.2d 1212 (1973).

. . . .

"... Here, Scottsdale withheld disapproval of the third-party defendants' actions until it became likely that Scottsdale would suffer a loss as a result of those parties' actions. By failing to promptly repudiate the allegedly unauthorized actions, Scottsdale was able to sit back and quietly accept any benefits resulting from the addition of Foley to All Temp's policy, without paying Foley for the losses sustained under the policy. As a result, we find that the trial court did not err in determining that Scottsdale ratified the third-party defendants' allegedly unauthorized acts." 28 Kan. App. 2d at 223-24.

The Court of Appeals also affirmatively answered the question whether Scottsdale's failure to repudiate blocked its breach of contract claim. It stated:

"The general rule is that an 'agent may be subject to liability to his principal because he has made an unauthorized contract for which his principal is liable.' Restatement (Second) of Agency § 383, comment e (1957). However, '[t]he ratification or other affirmance by a principal of an unauthorized act done by an agent in excess of his or her power to bind the principal releases the agent from liability for damages to the principal for having violated a duty to the principal.' Restatement (Second) of Agency § 416 (1957)." 28 Kan. App. 2d at 225.

Discussing application of the Restatement principle, the Court of Appeals stated:

"Although this is apparently an issue of first impression in Kansas, other jurisdictions have addressed whether an agent could be held liable where the principal ratified the agent's arguably unauthorized actions. For example, *Barta v. Kindschuh*, 246 Neb. 208, 518 N.W.2d 98 (1994), addressed whether the sellers of a home were entitled to indemnification from their real estate agent for damages suffered by the sellers for an alleged misrepresentation regarding the condition of the home. The Nebraska Supreme Court affirmed the trial court's grant of summary judgment in favor of the real estate agent. The *Barta* court held that even if the real estate agent exceeded his authority by failing to note the correct information as to the condition of the home on a form provided to the buyers, the sellers acquiesced in and ratified the agent's acts when the sellers read and signed the form that included misrepresentations regarding the condition of the home. 246 Neb. at 214-15.

"Other cases have held similarly. See, *e.g., Brooks v. January*, 116 Mich. App. 15, 321 N.W.2d 823 (1982) (holding that because a dissident faction of a church congregation ratified their pastor's unauthorized sale of property, the pastor was relieved from liability to the church); *Southwest Title Ins. Co. v. Northland Bldg.*, 542 S.W.2d 436 (Tex. App.1976), *rev'd in part on other grounds* 552 S.W.2d 425 (Tex. 1977) (holding that because the title insurance company ratified its agent's arguably unauthorized actions, the agent could not be held liable to the title insurance company); *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 104 Cal. Rptr. 57, 500

P.2d 1401 (1972) (holding that because a wife ratified forgery of her name on a deed of trust, the agent was relieved of liability to the principal)." 28 Kan. App. 2d at 225-26.

CNA would distinguish *Foley Co.* from the present case on the ground that the insurer in *Foley Co.* allowed the questionable situation to persist by renewing the policy while CNA acted promptly. In the present case, however, it is the extent of the action more than the timing that is wanting. In the present case, as in *Foley Co.*, the agent's unauthorized act was known to the principal (or in this case, the principal's delegate) but the principal failed to repudiate it. In this case, the principal failed to return Gaines' premium and continued to process his application while holding out the possibility of insuring him for a lesser amount than that sought. Moreover, there was a complete failure to comply with the statutory requirement for notifying the applicant in writing of the refusal to insure him for the amount requested. In these circumstances, Straub's unauthorized acceptance of Gaines' application and initial premium was ratified rather than repudiated by the principal. A district court's decision which reaches the right result will be upheld even though it relied upon the wrong ground or reason. *Bergstrom v. Noah*, 266 Kan. 847, 875-76, 974 P.2d 531 (1999).

Finally, CNA argues that disputed issues of material fact preclude summary judgment. CNA contends that it is disputed whether Straub acted in accordance with his duties as an agent and whether Straub informed NIR of the insurance application status. These facts are not relevant to the principal's ratification of Straub's acts, which is the basis for disposition of the cross-claim.

Affirmed.

DAVIS, J., not participating.

LARSON, S.J., and PAUL BUCHANAN, District Judge, assigned.